(Nos. 32387 and 32489.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* HENRY E. BECKER *et al.,* Plaintiffs in Error.

*Opinion filed March 23, 1953.*

Winston, Strawn, Black & Towner, of Chicago, (Frank Gilmer, and Calvin Sawyier, of counsel,) for plaintiff in error Henry E. Becker; Myer H. Gladstone, and Robert W. Heinze, both of Chicago, for plaintiff in error Ralph M. Block.

Ivan A. Elliott, Attorney General, of Springfield, and John Gutknecht, State's Attorney, of Chicago, (Abbey Blattberg, John T. Gallagher, Rudolph L. Janega, and Arthur F. Manning, all of Chicago, of counsel,) for the People.

Mr. JUSTICE FULTON delivered the opinion of the court:

The defendants, Henry E. Becker and Ralph M. Brock, were jointly indicted and tried for the crime of embezzlement in the criminal court of Cook County. They were found guilty by verdict of a jury, motions for a new trial and in arrest of judgment were overruled, applications for probation were denied and each defendant was sentenced by the court to serve a term of not less than two years nor more than five years in the Illinois State Penitentiary. Defendants prosecuted separate writs of error to this court in causes entitled People of the State of Illinois vs. Henry E. Becker, No. 32387, and People of the State of Illinois, vs. Ralph M. Brock, No. 32489. Because the principal assignments of error are the same in each case the causes have been consolidated for opinion here.

In the case of People v. Becker counsel for the State have filed a motion to strike the bill of exceptions. This motion was taken with the case and it becomes necessary to dispose of it before considering any of the various assignments of error.

It appears that the verdict of the jury was returned on April 27, 1951. Motions for a new trial and in arrest of judgment were then filed and argued. On June 11, 1951, both motions were overruled and an order was entered adjudging each defendant to be guilty of embezzlement as charged in the indictment and finding the value of the property embezzled to be $70,000, in accordance with the jury verdict. No sentence was imposed at that time, however, because counsel moved to have defendants released on probation and this motion was set for hearing June 26, 1951. On that date the court denied application for probation and sentenced the defendants. On October 1, 1951, the trial court entered its order extending the time for filing the bill of exceptions to November 11, 1951. On October 5, 1951, a hearing was held before the trial judge on motion of plaintiff in error for approval of the bill of exceptions.

Counsel for the People entered objections and the hearing was continued to October 11, 1951, at which time the bill of exceptions was presented to the trial judge and marked "presented" by him. The ground of objection to the presentation and filing of the bill of exceptions was that the 100 days allowed for filing had expired before October 1, 1951, the date of the order extending the time. After the bill of exceptions had been marked "presented" on October 11, 1951, plaintiff in error, Becker, renewed his motion to have the bill of exceptions certified and also to require the State's Attorney to deliver the possession of the bill of exceptions to the court. Finally, on January 28, 1952, the trial judge overruled the objections and entered an order certifying the bill of exceptions as approved, signed and ordered by the court filed *nunc pro tunc* as of October 11, 1951, the date of the original presentation.

The reasons advanced for striking the bill of exceptions are twofold: (1) That the bill of exceptions was not presented for filing in the trial court within the time prescribed by Rule 70A of this court, and (2) that the trial judge was without authority to sign the bill of exceptions *nunc pro tunc* as of the date presented. Rule 70A provides: "In all criminal cases in which writ of error is brought, the bill of exceptions or report of proceedings at the trial, if it is to be incorporated in the record on review, and other proceedings which the plaintiff in error desires to incorporate in the record on review, shall be procured by the plaintiff in error and submitted to the trial judge or his successor in office for his certificate of correctness, and filed in the trial court within one hundred (100) days after judgment was entered, or within such period thereafter as shall, during such one hundred (100) days, be fixed by the court, or in such further time as may be granted within any extended time. If it is impossible to procure the certificate of the trial judge within such time or extended time because of sickness, or other disability, or because, after a reason-

able effort he cannot be found at his office, or where he is customarily to be found in the county, then if such bill of exceptions or report of proceedings is presented in apt time to any other judge of said court, it shall be marked 'presented;' and if such bill of exceptions or report of proceeding be not signed and filed on the date presented, or within the time fixed or such extended time by the trial court, it may be signed by the trial judge after the date at which it was marked 'presented,' and shall be filed *nunc pro tunc* as of the date presented." 404 Ill. 10.

The first contention is bottomed on the proposition that the 100 days allowed for the filing of the bill of exceptions should be computed from the date of the judgment order of June 11, 1951, rather than from the date of sentence; that since more than 100 days had elapsed between June 11, 1951, and October 1, 1951, the date of the order extending the time for filing, the bill of exceptions could not be filed thereafter. This particular argument has already been rejected by this court in overruling a motion to strike the bill of exceptions in the companion case of People vs. Brock (order entered September 16, 1952.) The final judgment in a criminal case is the sentence. The date on which sentence is imposed is the date from which the time for filing under Rule 70A is to be computed. (See *People* v. *Kobley,* 390 Ill. 565; *People* v. *Kidd,* 401 Ill. 230.) Accordingly, if the bill of exceptions is filed or an extension of time for filing is obtained within 100 days of the date of sentence, the requirement of the rule is fulfilled.

As to the second ground of objection presented by the People's motion, it will be observed that the last clause of the second sentence of the rule specifically provides for the action taken by the trial judge in filing the bill of exceptions *nunc pro tunc* as of the date originally presented, but counsel argue that a proper construction of the rule requires that the action permitted by the concluding clause be limited to the situation mentioned in the first clause of the second

sentence of the rule, *i.e.*, the situation where the bill of exceptions is presented to a judge other than the trial judge. We believe that a proper construction and application of the rule calls for no such limitation. The first clause of the second sentence contemplates that the bill of exceptions will not be signed by the trial judge on the date presented because that clause deals explicitly with presentation to a judge other than the trial judge because of the illness or absence of the latter. The second clause of the second sentence begins with the language: "If such bill of exceptions or report of proceedings be not signed and filed on the date presented" and therefore deals with a situation which is not dependent upon the circumstances outlined in the first clause of the sentence. In short the second clause covers all cases where the bill of exceptions is not filed and signed when presented, including such cases as this where presentation is made to the trial judge, who delays signing and filing because of objections interposed by the People. The construction for which the State contends would permit a trial judge's delay in signing and filing the bill of exceptions, for whatever reasons, to preclude a defendant from obtaining a fair review of his conviction in a criminal case, notwithstanding the fact that the bill of exceptions had been presented in apt time and, as presented, had ultimately been approved by the trial judge. If the application of the latter provisions of the rule should be held subject to the limitations suggested by counsel for the People, then one who presented his bill of exceptions to a judge other than the trial judge in the first instance would be in better position than one who presented the record to the trial judge who delayed signing and filing beyond the time originally limited or extended, because, in the former situation the trial judge's signature could be obtained later, *nunc pro tunc* as of the date of original presentation, without obtaining any extension of time, while in the latter situation the trial judge would be held without

jurisdiction to approve once the original or extended time had expired. Such a construction of the rule is not required from its language. The words "such bill of exceptions or report of proceedings" are used in both the first and second clauses of the second sentence of the rule and refer to the words "bill of exceptions or report of proceedings" mentioned in the first sentence, and both clauses of the second sentence refer to any bill of exceptions or report of proceedings which might be presented, *i.e.*, to the trial judge or to another judge as mentioned in the rule. We hold, therefore, that the motion of the People to strike the bill of exceptions is not well-founded and it is overruled.

The indictment charging plaintiffs in error with embezzlement is framed under clause 2 of section 75 of division I of the Criminal Code (Ill. Rev. Stat. 1951, chap. 38, par. 208,) which provides: "Clause 2. If any director, officer, agent, attorney at law or in fact, of any incorporated company or institution, joint stock company, or voluntary association, shall fraudulently misapply or convert to his own use, without the consent of the owner thereof, any money or property belonging to any person, firm, corporation, State or other body politic and corporate, other than his principal or employer, which said money, or property, has come into his possession or is in his care or under his control by virtue of his being such director, officer, agent, attorney at law or in fact, of such incorporated company or institution, joint stock company or voluntary association, and which said money or property has come into the possession or is in the care or in the custody of such incorporated company or institution, joint stock company or voluntary association, as agent for any purpose of the owner thereof, shall be deemed guilty of larceny. 'Convert to his own use,' as used in this Act, shall mean the application or use of such money or property in any manner or for any purpose not authorized by the

owner thereof, or that he advised, authorized, directed, aided or knowingly consented to such use or application." The indictment, without its formal parts, charges in substance that on March 1, 1947, Ralph M. Brock and Henry E. Becker were officers and agents of Standard Coal Mining & Converters Corporation, an incorporated company; that without then and there having the consent of one Morris Greenberg, they then and there fraudulently, wilfully and feloniously misapplied and converted to their own use a large amount of money, personal goods, funds and property, to wit: (currency as described) of the amount and value in all of $70,000, the money, personal goods, funds and property of said Morris Greenberg, which said money, personal goods, funds and property had come into possession and then and there were in the care and under the control of said Brock and Becker by virtue of their being officers and agents of said Standard Coal Mining & Converters Corporation, as aforesaid, and which said money, personal goods, funds and property had come into possession of and then and there were in the care and custody of said Standard Coal Mining & Converters Corporation as agent of said Morris Greenberg; whereby and by force of the statute in such case made and provided the said Brock and Becker are deemed to have committed larceny. It is the principal contention of counsel for plaintiffs in error that the evidence fails to sustain the charge as made in the indictment; that instead of proving that the funds in question came into possession of the Standard Corporation as agent of Greenberg, the facts adduced at the trial show that the relationship between Greenberg and the corporation was that of buyer and seller, giving rise in final analysis only to a creditor-debtor status upon which criminal liability for embezzlement cannot be predicated. An examination of the evidence is therefore necessary.

Standard Coal Mining & Converters Corporation was organized in 1942 and was engaged primarily in mining

and selling coal. It owned a large mine located at Standard City, Macoupin County, where about 100 persons were employed. Its offices were located at Standard City and in the city of Chicago. Plaintiff in error Becker, an electrical and mechanical engineer, was vice-president of the Standard Company; his codefendant, Ralph M. Brock, was president and treasurer. While the corporation was engaged primarily in the coal business, the evidence shows that during the period of the steel shortage in 1945, 1946 and 1947, the company sold and delivered about $1,000,000 worth of steel, mainly through connections with steel firms in Pennsylvania. The corporation had accounts in City National Bank and Trust Company and the Southeast National Bank, both located in Chicago. It had established a line of credit with the former institution against which letters of credit were issued from time to time in connection with steel purchases. One of the customers for steel had been a Mr. Lefferding who lived in New York.

The complaining witness, Morris Greenberg, was engaged in the steel business. He had a controlling interest in the Steel Service Company located at Brooklyn, New York, which was engaged in the business of buying and selling steel; he was also a partner in a steel fabricating business known as "Hafecost" located in New Jersey. Greenberg found himself very short of steel in the latter part of 1946. This was the period of the "gray market" and it appears that many of those in the business were more interested in obtaining steel than concerned with means and methods used to get it. Greenberg was acquainted with Lefferding and learned from him that he had been successful in getting some steel from the Standard Corporation. On November 14, 1946, Greenberg appeared at the Chicago offices of Standard. Neither Brock nor Becker had ever seen him before. Greenberg had with him a written order for the purchase of steel which he brought on behalf of Lefferding, together with Lefferding's check for $5000,

which was the amount of the deposit on Lefferding's order at the rate of $5 per ton. Greenberg delivered Lefferding's order and check to Brock. Greenberg also had with him a written purchase order for 4000 tons of steel which he presented on behalf of his Steel Service Company. This purchase order had been prepared by Greenberg himself in his New York offices prior to coming to Chicago. The order recites that a check for $20,000 is attached representing a deposit of $5 per ton which deposit is to be returned if delivery is not made in the last quarter of 1946. Brock accepted this order on behalf of the Standard Company. The check for $20,000, payable to the Standard Company, was delivered by Greenberg to Brock. Greenberg testified that he does not remember that anything was said about how the $20,000 was to be used. Brock testified that Greenberg first requested that the funds be put in trust; that he advised Greenberg that they were not interested in the order under those circumstances whereupon Greenberg accepted Brock's conditions and was advised that it was to go into the general funds of the Standard Company. The day following these transactions Brock wrote a letter to the Steel Service Company confirming the order and deposit. He stated that should any part of the order be undelivered as of December 31, 1946, the unused portion of the deposit would be refunded or the balance could carry over until January at the option of the Steel Service Company.

The steel was not delivered by December 31, but Greenberg did not ask for the return of his deposit. Instead he asked for the delivery of steel. He continued to request delivery in person and by telephone during the months of January and February of 1947. During this time it appears that there were negotiations for other orders of steel which did not materialize. It also appears that one carload of steel was sold by Standard to the Service Company which was received at the Hafecost plant. This was

a separate transaction and involved no part of the original order for 4000 tons.

On February 20, 1947, Greenberg was present at the Chicago offices of the Standard Company where he presented an order for 1500 tons of sheet steel. On this occasion he dealt with Becker and delivered to Becker the check of the Service Company for $50,000, payable to the Standard Corporation. It appears that the normal deposit required on this order would have been $75,000 but that the $20,000 which the Standard Company owed because of its failure to deliver under the November order was to be applied. The agreement is evidenced by a letter sent by Becker to Greenberg on February 21, 1947, which set forth the details of the transaction. Greenberg placed his written acceptance on this letter. A letter from Becker to Greenberg, dated March 15, advised Greenberg that the $50,000 down payment had been deposited "in the usual manner" in the bank "without giving special instructions of any kind." There is no evidence that Greenberg ever protested this arrangement. He testified at the trial that it was his understanding that the $50,000 was to be "kept on the side." This is denied by both Becker and Brock. There is evidence that at this time commitments from a steel mill had been obtained by the Standard Corporation on its own account and that an irrevocable letter of credit had been issued by Standard to the mill against future deliveries of steel. The mill failed to make delivery to Standard although at one time, under date of March 21, a memorandum showing four carloadings of steel for Greenberg had been furnished.

No steel was ever received by Greenberg under the orders upon which the $70,000 was deposited and no part of the deposit money was ever returned to him. Greenberg did not demand return of the deposits until sometime in April. In the meantime he continued to request delivery

of steel. The Standard Corporation was adjudicated a bankrupt on May 10, 1947, and a receiver of all its assets was appointed. Meanwhile, in April, Nathan Herman, Greenberg's attorney, had interviewed Brock at Herman's offices in New York City. At this time Herman told Brock that a crime had been committed and demanded return of the $70,000 under threat of criminal prosecution. In June of 1947, Herman came to Chicago where he saw both Brock and Becker. Under a plan of securing a preference for Greenberg in the bankruptcy proceedings Herman persuaded Brock and Becker to sign a paper he had prepared which recited that they had received $70,000 from Greenberg "entrusted" to them for the sole purpose of purchasing steel for Greenberg. The document further recited that the sum had been deposited in the funds of the Standard Corporation and used by it to buy certain items of equipment for certain amounts. These items and the respective amounts were listed in the document. Apparently Herman thought that with this paper he could secure a preference in the bankruptcy proceedings by tracing trust funds into specific items of property. This paper is undated and the items listed are filled in in pencil. Brock and Becker testified that this was a preliminary draft only; that they had told Herman that it would be necessary to secure the approval of their attorney before they signed it and that a final draft was to be prepared by Herman and submitted to counsel for Brock and Becker. It also appears that such final draft was presented but that Brock and Becker had been advised that Herman's plan was illegal and that they therefore refused to sign the final draft. Greenberg realized only about $2000 on his claim in the bankruptcy proceedings. He was not allowed a preference.

The evidence shows that both the $20,000 check and the $50,000 check were deposited in the Standard Corporation account in the City National Bank and Trust Company. Ledger sheets of the company's account in that bank intro-

duced in evidence show that substantial deposits were made in this account following the deposit of the $20,000 check on November 15. These deposits exceeded $80,000. After the deposit of Greenberg's check for $50,000 on February 24, deposits exceeding $90,000 were made by March 25 and an additional $85,000 was deposited up to the time of bankruptcy. During this entire period there were also substantial withdrawals by checks signed by both defendants. In addition to meeting ordinary corporate expenses, substantial amounts were withdrawn and paid to both defendants to repay them for loans made to the corporation. A considerable number of withdrawals were made from the City Bank account by checks made payable to cash and the cash thus obtained was taken by messenger to the Southeast National Bank and deposited in the corporation account there. Defendants explained this procedure by stating that the payroll for the mine was handled out of the account at the Southeast National Bank and that to insure that that account would be immediately credited with sums necessary to meet the payroll, cash was transferred instead of giving checks for deposit which would require three days for clearance. Counsel for the People contend that this practice evidences a scheme of the defendants to prevent the tracing of withdrawals. Counsel for the People cross-examined defendants at length as to the various withdrawals. Most of these were explained as expenses for corporate purposes, including repayment of the loans. Where explanation of a particular item could not be recalled, defendants usually explained that the corporate books would show the purpose. It appears that the State's Attorney had the corporate books and records of the Standard Company in his possession at the time of trial. Except for numerous cancelled checks these records were not produced or offered in evidence.

The proposition that it was incumbent upon the People to prove beyond a reasonable doubt each of the essential elements necessary to constitute the crime charged requires

no citation of authority. Among other matters it was necessary that the evidence for the prosecution establish beyond a reasonable doubt that for the purposes of the transactions between them the Standard Coal Mining & Converters Corporation was the agent of Greenberg. This was alleged in the indictment and it was a necessary allegation under the statute in question. Failure to prove that allegation beyond a reasonable doubt would be fatal to the State's case. Counsel for the People concede this to be true but earnestly contend that the evidence establishes the agency relationship; that the Standard Corporation was acting as a broker in purchasing steel for Greenberg; that as agent and broker it received his funds which it was bound to use for the purpose of purchasing steel for Greenberg and for no other purpose. Counsel for plaintiffs in error say that the evidence not only fails to prove agency but positively establishes that the Standard Corporation made an outright sale of steel to Greenberg upon which he made a deposit or down payment; that the funds paid over by Greenberg, once they had been received by Standard, were not Greenberg's funds but were part of the purchase price and became the property of the Standard Corporation following which a creditor-debtor relationship existed.

The question whether a person is an agent to buy goods for another or is a seller buying goods on his own account and reselling is one which arises frequently in both civil and criminal litigation. Mechem in his work on Agency (Mechem on Agency, 2d ed. 1914, sec. 46,) lists several criteria for determining whether the relationship is one of principal and agent or of buyer and seller. If the person who is to supply the goods is to do so at a fixed price so that risk of price fluctuation is upon him, the transaction partakes of the nature of a sale rather than an agency. If the goods are to be obtained on the credit of the supplier without possibility of recourse on the person ultimately

receiving the goods, that, too, colors the transaction as a sale. Again, if the supplier determines of whom, where and upon what terms the goods are to be procured, he appears as a seller rather than an agent. A careful inspection of the documentary evidence and the other evidence in this case, particularly that showing the conduct of the parties, leads inevitably to the conclusion that Greenberg was purchasing steel from the Standard Corporation rather than hiring it as his agent to buy. Greenberg prepared and presented what he himself termed a "purchase order" for steel of a definite quantity and description at a fixed price. He made what he termed a $20,000 "deposit" on the order. He does not claim that anything was said about any special disposition of the $20,000 and it appears that he knew that it had been deposited in the general account of the Standard Corporation. This check was made payable to the Standard Corporation without restriction and not to the Standard Corporation as agent. Greenberg was likewise advised that the $50,000 check had been deposited in Standard's bank account without giving special instructions of any kind. He raised no question about the deposit at the time. There appears to have been no talk of "entrusting" or of "trust funds" until after Greenberg had hired Herman as his attorney to collect for him. Then, and only then, was return of the money demanded. In fact, in Herman's first conversation with Brock, Herman still talked about delivery of the steel.

It also appears that the steel was to be purchased upon the sole credit of the Standard Corporation. Counsel for the People infer that Standard never had a line of credit sufficient to handle as large an order as those placed by Greenberg. Nevertheless, as between Greenberg and Standard, Standard was to supply the line of credit and the suppliers' only recourse under the arrangement would have been against the Standard Corporation. The evidence further shows that Greenberg knew nothing about where Stand-

ard was to obtain the steel. After there had been some delay, Greenberg requested this information but it was refused. These facts are undisputed and all indicate a sale rather than a brokerage transaction.

Counsel for the People emphasize the evidence concerning withdrawals from the corporate bank accounts and methods of handling the corporate business following receipt of the funds from Greenberg, but this evidence is immaterial, so far as the charge here is concerned, without proof that an agency or fiduciary relationship existed. Without proof of that material element, we have no occasion to consider the question whether or not there was a conversion with criminal intent. As to the undated writing obtained by Herman from plaintiffs in error some time after the bankruptcy, we say that the circumstances under which it was obtained cast doubt on its reliability. It is directly contrary to most of the evidence heretofore discussed, which we believe is the more reliable because free from any question of duress or ulterior motive. It definitely appears that Herman had the question of a preference in the bankruptcy proceedings in mind when he presented the paper for signature. If it were otherwise clear that Brock and Becker had been "entrusted" with the funds for a special purpose, it should not have been necessary to obtain their signatures to such a document in any event. Convincing evidence is lacking that there was any special agreement on the part of Brock or Becker to hold the checks or their proceeds separate and apart for the special purpose of buying steel for Greenberg. In the absence of such an agreement, a person making an advance payment under a contract of sale cannot reasonably expect that the same money or deposit paid over will be returned to him in the event of failure to deliver. In other words, there is a distinction, so far as legal consequences are concerned, between that situation where there has been an outright sale and those involving an agency or a bailment. Evidence

of the type of transaction which leads only to the debtor-creditor relationship will not support a charge of embezzlement or larceny by bailee. *People* v. *Streich,* 361 Ill. 490; *People* v. *Robinson,* 352 Ill. 596.

Counsel for the People contend that plaintiffs in error cannot be heard to argue that the transactions between the Standard Corporation and Greenberg amounted to a sale because they failed to take that position in the trial court. Suffice it to say that the motion for a new trial specified as one of its grounds that the verdict and judgment were against the evidence. This, for whatever reasons, questions the legal sufficiency of the proof to support the charge. The reasons assigned by counsel on argument are immaterial. We believe that the question here presented was properly preserved for review. It is, of course, true, as counsel for the People say, that a trial court's denial of a motion cannot be attacked in a court of review upon grounds not presented to or ruled upon by the trial judge, but where the written assignment of error in a motion is broad enough to cover a number of possible reasons which might be presented, failure of counsel to cover all of them in oral or written argument in the trial court does not preclude advancing additional arguments or theories in this court. It might be added that at the close of the People's case a motion for a directed verdict was made and overruled. The failure of the trial court to sustain this motion was also assigned as one of the reasons for granting a new trial.

Numerous other assignments of error have been made and argued by counsel, but it becomes unnecessary to discuss them. For the reasons given, the judgment of the criminal court of Cook County is reversed.

*Judgment reversed.*