(No. 36367.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* BURKS WILLIAMS, Plaintiff in Error.

*Opinion filed January 23, 1692.*

JULIUS LUCIUS ECHELES, appointed by the court, and JACK MARCUS, both of Chicago, for plaintiff in error.

WILLIAM G. CLARK, Attorney General, of Springfield, and DANIEL P. WARD, State's Attorney, of Chicago, (FRED G. LEACH, Assistant Attorney General, and JOHN T. GALLAGHER and WILLIAM L. CARLIN, Assistant State's Attorneys, of counsel,) for the People.

Mr. CHIEF JUSTICE HERSHEY delivered the opinion of the court:

Upon trial by a jury, defendant was convicted of the crime of unlawful possession of narcotic drugs, and was sentenced to the penitentiary for a term of from two to five years. He brings this writ of error, contending that he was not proved guilty beyond a reasonable doubt and that his

right to a fair trial was prejudiced by certain actions of the prosecution.

The evidence shows that two police officers went to defendant's apartment on an investigation unrelated to any narcotics charge. Before they reached the door leading to the apartment, the defendant came out. One of the officers identified himself as a police officer, and was thereupon assaulted by the defendant. A cereal box which defendant was carrying fell to the floor. The box contained seven glass bottles and three envelopes. There were pills in each bottle and envelope.

The director of the police crime laboratory, a graduate chemist, performed a qualitative test on the tablets found in two of the bottles. He testified that in his opinion one of the exhibits contained morphine sulphate, and the other contained methadon hydrochloride, both of which the witness characterized as narcotic drugs. On cross-examination, the chemist testified that he did not make a specific quantitative test but estimated quantitatively, and that the exhibit tested contained something less than two grains of morphine sulphate. With respect to his examination of the methadon hydrochloride, the witness stated that he found "2 dimethyl-amino-4-4 diphenyl and heptanone-3" but that he didn't run a quantitative test to find the concentration. He further testified that both substances tested are sleeping tablets prescribed by doctors for the use of patients, that they are usually found in prescription pharmacies, and that the description on the bottles indicated that they came from two well-known, large and reputable pharmaceutical houses.

Defendant contends that the evidence failed to prove that he possessed narcotic drugs in violation of the Uniform Narcotic Drug Act. His argument on this point is twofold. First, he contends that it was not established that the methadon hydrochloride found in some of the tablets is a narcotic drug within the statutory definition. (Ill. Rev. Stat. 1957, chap. 38, par. 192.28—2.17.) Secondly, he contends

that the quantity of morphine sulphate found was within the amount exempted by statute. (Ill. Rev. Stat. 1957, chap. 38, par. 192.28—12.) We shall deal with these contentions in order.

"Methadon," which is listed as a narcotic drug by the statute (Ill. Rev. Stat. 1957, chap. 38, par. 192.28—2.17), is defined therein as "the substance identified chemically as 4-4-Diphenyl-6-Dimethylamino-Heptanone-3, or any salt thereof by whatever trade name identified." On cross-examination, the People's chemist testified that, in his examination of the methadon hydrochloride, he found "2 dimethylamino-4-4 diphenyl and heptanone-3." Defendant argues that the methadon hydrochloride found by the chemist is not a narcotic within the meaning of the statute, since the testimony referred to "2 dimethylamino," while the statutory formula for methadon says "6 dimethylamino."

The statutory definition of methadon includes not only the substance having the precise chemical formula recited therein, but also "any salt thereof." It would seem, therefore, that the real question is whether the substance disclosed by the chemical analysis is a salt of the substance having the formula set forth in the statute. Unfortunately, neither the record nor the briefs of the parties contain anything that assists us in determining the answer to this question. Since the record clearly indicates that the substance tested was not identical in its formula with that defined in the statute, and since there is no evidence showing that the substance found is a salt of methadon within the statutory definition, we agree with defendant's contention that the State failed to prove that this substance is a narcotic drug within the prohibition of the statute.

We turn next to the question of whether the evidence with respect to the morphine sulphate is sufficient to sustain the conviction. Defendant does not question that morphine sulphate is a narcotic drug within the meaning of the statute. Rather, he points to the testimony of the People's expert

witness that the exhibit tested contained less than two grains of morphine sulphate and argues that this amount is exempted by statute. The pertinent provision of the statute provides: "Except as otherwise in this Act specifically provided, this Act shall not apply to the following cases: (1) Prescribing, administering, dispensing, or selling at retail of any medicinal preparation that contains in one fluid ounce, or if a solid or semi-solid preparation, in one avoirdupois ounce, (a) not more than two grains of opium, (b) not more than one-quarter of a grain of morphine or of any of its salts * * *."

The People contend that this exemption is not available to the defendant, first, because the record contains no suggestion that the substance was a medicinal preparation, and, second, because the exemption, by its literal terms, relates only to "prescribing, administering, dispensing, or selling at retail" and not to possession. The contention that the record contains no suggestion that the substance was a medicinal preparation cannot be sustained. The evidence shows that the substance was a sleeping tablet, prescribed by physicians for their patients, that it is commonly found in pharmacies, and was manufactured by a well-known pharmaceutical company. In our opinion, there can be no question but that the substance was a medicinal preparation within the meaning of the statute.

The failure of the statute expressly to exempt the possession of a medicinal preparation containing less than the specified concentration of opium or its derivatives poses a more serious problem. While the statute does not by express terms exempt possession, the exemption of selling necessarily includes the exemption of possession by the seller and strongly suggests that possession by the buyer is also exempted. It would be anomalous to hold that the sale of a preparation is perfectly legal but that the purchaser is immediately guilty of illegal possession. To so hold would defeat the very purpose of the exemption. The failure ex-

pressly to exempt possession of medicinal preparations containing less than the specified concentration is obviously an inadvertent omission which this court will supply where, as here, it will effectuate the obvious intent of the legislature. See, e.g., *People ex rel. Simpson* v. *Funkhouser,* 385 Ill. 396, 403; *People ex rel. Stewart* v. *Highway Comm'rs. of Town of Anchor,* 279 Ill. 542, 547.

Defendant seemingly interprets the statute as providing a flat exemption of two ounces or less of the narcotic. It is apparent, however, from a reading of the statute that the exemption relates not to quantity as such, but rather to the degree of concentration. What is exempted is not any specific quantity of a narcotic, but rather medicinal preparations containing no more than a specified concentration of the narcotic. The statute exempts preparations containing no more than two grains of opium or one-quarter of a grain of morphine per one avoirdupois ounce of the preparation.

Here the record contains no evidence as to the concentration of morphine sulphate in the substance tested. There is, therefore, nothing to indicate whether or not the substance tested was in fact within the terms of the exemption. In passing upon the sufficiency of the evidence to sustain the conviction, it is, therefore necessary to determine whether, under these circumstances, the burden was upon the State to prove that the preparation contained a concentration of the narcotic in excess of the permissible limits or whether it was incumbent upon the defendant to prove that the concentration was within the permissible limits.

Section 39 of the act provides: "In any complaint, information, or indictment, and in any action or proceeding brought for the enforcement of any provision of this Act, it shall not be necessary to negative any exception, excuse, proviso, or exemption, contained in this Act, and the burden of proof of any such exception, excuse, proviso or exemption, shall be upon the defendant." (Ill. Rev. Stat. 1957, chap. 38, par. 192.28—39.) While literal application of the

last clause of the section suggests that the burden was upon the defendant to prove, by chemical analysis, that the substance contained a concentration of the narcotic within the permissible limits, to so hold would lead to some rather startling results. Almost any medicine cabinet in the average American home is likely to house medicinal preparations containing some opium or morphine. It seems unlikely that the legislature would have intended that a citizen could be convicted upon mere proof of possession of such a preparation unless he assumed the burden of establishing by a chemical analysis that the preparation contained a concentration of narcotics within the permissible limitations. And, if the legislature did so intend, there would be obvious questions as to the validity of the statute. The constitutionality of a statutory provision almost identical with section 39 of our narcotics law was upheld by the Supreme Court of Louisiana in *State* v. *Jourdain*, 225 La. 1030, 74 So. 2d 203 (1954). However, the Louisiana court reached this result by emphasizing the first part of the section dispensing with the necessity of negating exemptions in the indictment and ignoring the second part relating to burden of proof and concluding that the section was purely procedural and did not change the burden of proof.

It is a fundamental principle of Anglo-American law that in all criminal prosecutions the burden is upon the State to establish the guilt of the defendant beyond a reasonable doubt. To apply the statute in this situation as requiring the defendant to prove affirmatively beyond a rasonable doubt, or even by a preponderance of the evidence, that the medicinal preparation possessed by him contained no greater concentration of morphine than that permitted by law would run counter to this fundamental principle. We believe that the statutory provision which states that the burden of proof of the exemption shall be upon the defendant must be applied to this situation in such a way that it does not conflict with the principle that places upon the

556

State the burden of proving the defendant guilty beyond a reasonable doubt. Thus, if there is in this record evidence sufficient to raise a reasonable possibility that the defendant comes within the exemption thus creating a reasonable doubt of his guilt, the defendant has met the burden of proof imposed upon him by the statute. Where, as was the case in *People* v. *Palumbo,* 5 Ill.2d 409, there is no suggestion in the record that the substance containing narcotics is a medicinal preparation, the State is not required to prove the concentration. But where, as here, the substance possessed by the defendant has been shown to be a·medicinal preparation produced by a reputable pharmaceutical company, a reasonable doubt as to the defendant's guilt has been created, and the conviction cannot be sustained in the absence of evidence proving that the concentration of narcotics in the preparation exceeded that permitted by the statute. The evidence was insufficient to prove the defendant guilty beyond a reasonable doubt.

Since the judgment of the trial court must be reversed because of the insufficiency of the evidence, it is unnecessary for us to consider the other contentions made by the defendant on this writ of error.

The judgment of the criminal court of Cook County is reversed.

*Judgment reversed.*