THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
JAMES ARMSTRONG (Impleaded), Defendant-Appellant.

First District (1st Division)   No. 77-1491

Opinion filed September 25, 1978.

Ralph Ruebner and Patricia Unsinn, both of State Appellate Defender's Office, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Lee T. Hettinger, Pamela L. Gray, and Ira H. Raphaelson, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE O'CONNOR delivered the opinion of the court:

Defendant, James Armstrong, was indicted for two counts of delivery of a controlled substance in violation of section 401(d) of the Illinois Controlled Substances Act (Ill. Rev. Stat. 1973, ch. 56½, par. 1401(d)). After a jury trial, defendant was found guilty of one count and not guilty of the other. He was sentenced to five years probation, the first six months to be served at the Cook County Jail. Defendant appeals, arguing that (1) he was not proved guilty beyond a reasonable doubt, (2) the physical evidence was improperly admitted, (3) a witness was allowed to testify to facts outside his personal knowledge, (4) defendant was deprived of his right to present a defense by the State's threat to impeach him and another defense witness with evidence of a prior criminal conviction, (5) testimony and argument that defendant had participated in other offenses was improperly presented to the jury, (6) the jury was not instructed that

defendant must knowingly deliver a controlled substance, and (7) defendant was denied his right to due process of law by the State's closing arguments.

Bernice Ziolkowski, a Chicago police officer, testified that on June 19, 1975, she was on a plain clothes detail in the vicinity of 31st and Halsted Streets. She and Officer Nelson met Danny Wojkowski and a man named Johnny in a restaurant. After a short conversation, Danny made a telephone call, returned to the table and told them they were going to 5111 South University Avenue. Upon arriving at the University address, Danny took them to apartment 208, where they were admitted by the defendant. Defendant and Danny went to the kitchen. Approximately one minute later, Armstrong came into the living room where Ziolkowski was seated and asked who had the money. Officer Nelson gave Armstrong $50; Ziolkowski gave him $10. Defendant removed a brown cloth bag from the top of the stereo. He took the bag to the kitchen table, removed a plastic bag filled with red and blue capsules from the cloth bag and put the plastic bag on the table. Defendant told Ziolkowski and Nelson to count $60 worth. Ziolkowski asked defendant how many capsules she got for $60. He told her 60. She put the capsules in a manila envelope given her by defendant and gave it to Nelson, who put it in her purse. Danny gave Armstrong some money and received capsules from him. Nelson asked to buy 10 more capsules and gave $10 to Danny, who gave it to defendant. Ten capsules were passed from defendant to Danny to Nelson. Nelson put the capsules in a white envelope and put it in her purse. After leaving defendant's apartment, Nelson and Ziolkowski dropped Danny and Johnny at 31st and Halsted Streets.

At the police station at 39th and California, Officer Ziolkowski made an inventory of the capsules received from defendant. She placed the manila and white envelopes in a completed narcotics envelope. Ziolkowski sealed the envelope, signed the back and put tape over her signature. She gave that envelope to Nelson, who took it to the laboratory. Ziolkowski identified an envelope from the evidence and recovered property section of the Chicago Police Department. Inside that envelope was the property inventory form Ziolkowski completed on June 19, 1975, which bore her signature and that of Nelson. The prosecutor gave Ziolkowski a sealed plastic bag with the same inventory number as the form. In the sealed plastic bag, which was opened in court by Ziolkowski, was the narcotic envelope she had completed, signed and sealed on June 19, 1975. Her seal on the narcotic envelope remained intact, but the envelope had been opened on the side. Where it had been opened, the envelope was resealed, stapled and taped. Inside the sealed narcotic envelope were the manila and white envelopes Ziolkowski had placed in it on the night of the offense. The white and manila envelopes had been opened, resealed

and signed by the chemist. The manila and white envelopes contained capsules identical to those she and Nelson bought from defendant. Some of the capsules from both envelopes had been torn open and resealed with plastic.

On cross-examination, Ziolkowski testified that she had made no mark on the manila and white envelopes placed in the narcotic envelope. The officers did not attempt to make a tape recording of the conversation in defendant's apartment. She and her partner were observed by other officers on the night of the incident. She did not know whether the money given the defendant was marked. She told Danny what she wanted and presumably Danny told Armstrong. The officers thought they would get Tuenol downers from defendant but did not ask him for them.

George Halko, a Chicago police officer assigned to the position of evidence technician, testified for the State. He had been a Chicago Police Department forensic chemist for three years. He has a bachelor's degree in chemistry from St. Xavier College and is a member of professional associations in chemistry and forensic science. Halko and an associate wrote a paper on chromatography. He identified the narcotic envelope as the one that he opened in the laboratory on July 18, 1975. When he received the envelope from the chief chemist its flap was sealed, as it was at trial. He slit the narcotic envelope and removed a manila envelope and a white envelope. The manila envelope contained about 60 capsules weighing 16.50 grams; the white envelope contained 10 capsules weighing 2.26 grams. He then performed a chemical analysis on two capsules from the manila envelope and one from the white envelope. The capsules contained a derivative of barbiturate acid belonging to schedule II of the Controlled Substances Act. He then sealed the capsules he tested with tape, initialed the tape and returned the capsules to the envelopes. Halko sealed the envelopes and placed them in the narcotic envelope, which he stapled closed and marked. He placed the narcotic envelope in a clear plastic bag, which he sealed. Halko signed the form on the plastic bag. It was taken to the repository. The plastic bag was the same bag opened at trial.

When cross-examined, Halko was unable to recall whether the manila envelope and the white envelope were sealed when he received them. He had seen several thousand capsules like those in the envelope. He received only one half of the white envelope. Halko tested other material on the day he tested these capsules. Halko could not recall whether he took the plastic envelope to the evidence and recovered property section. The narcotic envelope was sealed when he received it. The contents of the white and manila envelopes were consistent with the accompanying inventory sheet. The substance in the capsules was a derivative of barbiturate acid which is hypnotic.

On recross-examination, Halko testified that the capsules contained a substance known by the trade name of Tuenol. It is not a depressant.

Linda Nelson, a Chicago police officer, testified that while she was working on an undercover detail on June 19, 1975, at approximately 9 p.m., she and Officer Ziolkowski went to 5111 South University Avenue with Danny Wojkowski and a man named Johnny. Nelson asked defendant if he had the pills and he said he did. He asked who had the money and Ziolkowski said she had $10; Nelson said she had $50. The officers gave defendant the money. Armstrong took a cloth bag from the stereo and went into the kitchen. He removed a plastic bag containing capsules from the cloth bag and put it on the kitchen table. Defendant told them to count $60 worth. In response to Ziolkowski's question, defendant said 60 pills were worth $60. As they were leaving, Nelson asked if she could buy more pills. Armstrong said sure. She gave $10 to Danny, who gave the money to defendant. Defendant gave Danny 10 pills. After Danny gave her the pills, she put them in a white envelope given to her by Officer Ziolkowski. At the police station, Ziolkowski inventoried the capsules and Nelson typed the case report. The envelopes containing the capsules were placed in a narcotic envelope. Ziolkowski sealed the envelope; both officers signed it. Nelson hand delivered the narcotic envelope to police headquarters shortly after midnight on June 20, 1975.

On cross-examination, Nelson testified that no tape recording was made of the events at the defendant's apartment on June 19, 1975. Defendant was not arrested until August 1975. There were four women in the apartment with defendant when Danny, Johnny and the officers arrived, but nothing was done to hide the pills. Nelson could not recall whether she sealed the envelope before she put it in her purse. The receipt from the laboratory was dated June 19, 1975, 12:36 a.m., although the sale took place at about 9 p.m. on June 19, 1975. Nelson said the receipt is mistaken because she had taken the envelope to the laboratory at about 12:30 a.m. on June 20, 1975. She did not recall that the envelope Ziolkowski gave her in defendant's apartment was a Chicago Police Department envelope. She did not mention the women in her grand jury testimony because she was not asked about them.

Rufus Brown, a Chicago police officer assigned to the police laboratory desk, testified for the State. He issued a receipt to Officer Nelson which stated that the evidence in this case was received by him on June 19, 1975, at 12:36 a.m. He could have been mistaken about the date when he filled out that receipt.

Louise Hayes testified for the defendant. She was at defendant's apartment on June 19, 1975, with defendant and three other women. They spoke about the recent death of a jazz musician. A white man named

Danny came to the apartment with two white girls. In the short time Danny and the two girls were there, nothing unusual occurred. They continued talking and playing records. She did not see any pills or narcotics at the defendant's apartment. She has never seen defendant sell pills or narcotics of any kind.

Kathleen Murray testified for defendant. She was at his apartment on June 19, 1975, when a man named Danny came there with two white girls. Danny and the girls left a short time after they arrived. She did not see defendant sell any pills to Danny and the girls. She never saw defendant sell any pills.

Diane Craft, a witness for defendant, testified that on June 19, 1975, she visited defendant at his apartment. While she was there, a white man and two white women came to the apartment. She did not see defendant sell them any pills.

Theodoria McNeil testified that while she was at defendant's apartment on June 19, 1975, a white man and two white ladies came to the apartment. They left after a short time. Defendant did not sell or give the white man and ladies any pills, controlled substances or narcotics.

Defendant was indicted for delivery of a controlled substance (a derivative of barbituric acid) in violation of section 401(d) of the Illinois Controlled Substances Act (Ill. Rev. Stat. 1973, ch. 56½, par. 1401(d)), which provides:

> "Except as authorized by this Act, it is unlawful for any person knowingly to manufacture or deliver, or possess with intent to manufacture or deliver, a controlled substance. Any person who violates this Section with respect to: * * * (d) any other amount of a controlled substance classified in Schedule III is guilty of a Class 3 felony. The fine for violation of this subsection (d) shall not be more than $15,000; * * * ."

The pertinent subsection listing the substances included in schedule III provides (Ill. Rev. Stat. 1973, ch. 56½, par. 1208(c)):

> "(c) Unless listed in another schedule, any material, compound, mixture, or preparation which contains any quantity of the following substances having a potential for abuse associated with a depressant effect on the central nervous system:
>
> > (1) Any substance which contains any quantity of a derivative of barbituric acid, or any salt of a derivative of barbituric acid."

The State's expert witness testified that the substance was a derivative of barbiturate acid belonging to schedule II and was not a depressant but an hypnotic.

Defendant argues that the State failed to prove him guilty beyond a

reasonable doubt because no proof was adduced that he delivered a controlled substance classified in schedule III.

The State argues that the "basic crime" is delivery of a controlled substance and that proof of delivery of a schedule II rather than of a schedule III substance is merely a variance which did not prejudice defendant. We disagree.

■■■ The State has the burden to prove each and every element of a crime beyond a reasonable doubt. (*People v. Becker* (1953), 414 Ill. 291, 111 N.E.2d 491.) In the present case, the State was required to prove that the substance allegedly delivered was a derivative of barbituric acid which had a depressant effect on the central nervous system. (Ill. Rev. Stat. 1973, ch. 56½, par. 1208.) The State's chemist said the substance was a derivative of barbiturate acid, but no reference to such substance is found in schedules II or III. (See Ill. Rev. Stat. 1973, ch. 56½, pars. 1206 and 1208.) Even if we assume that the record is in error and the witness really said barbituric, not barbiturate, acid, then there is still a reasonable doubt of guilt because the witness further stated that the substance was not a depressant, as required in schedule III, but an hypnotic. We find the case of *People v. Williams* (1962), 23 Ill. 2d 549, 179 N.E.2d 639, apposite here. In *Williams*, the State's chemist testified that the substance involved was a narcotic drug, but stated that he found "2 dimethylamino-4-4 diphenyl and heptanone 3" although the statutory formula was "6 dimethylamino." The court held that because the substance was not identical to that proscribed, the State failed to prove that the substance was a proscribed narcotic. (23 Ill. 2d 549, 552.) This court has also held the State to its burden in a case in which there was evidence that the substance was the substance proscribed but none that it was habit-forming as required by the statute then in effect. (*People v. Fischer* (1973), 15 Ill. App. 3d 557, 304 N.E.2d 742 (abstract).) Defendant in the case at bar was not proved guilty of the delivery of a controlled substance beyond a reasonable doubt.

The State's argument concerning variance correctly states the law, but it is inapplicable because, unlike the cases cited by the State, there was no proof of another crime or of another manner of committing the same offense. Here there was a failure to prove all the elements of the crime charged.

Because we find that the defendant was not proved guilty beyond a reasonable doubt, it is unnecessary to consider the other arguments raised by defendant.

The judgment of the circuit court of Cook County is reversed.

Reversed.

GOLDBERG, P. J., and McGLOON, J., concur.