THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* LLOYD OTTEN, Defendant-Appellant.

First District (2nd Division)   No. 80-228

Opinion filed December 9, 1980.

Barnett, Ettinger, Glass, Berkson & Braverman, Ltd., of Chicago (Marc M. Barnett and Dennis M. Zitzer, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr and Joel A. Stein, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE STAMOS delivered the opinion of the court:

Following a bench trial defendant Lloyd Otten was convicted of the delivery of a controlled substance (Ill. Rev. Stat. 1975, ch. 56½, par. 1401(d)) and sentenced to serve not less than one nor more than 4 years. On appeal defendant contends that he was not proved guilty of delivering phencyclidine (PCP) and that the court erred in entering a finding of guilty after expressing doubts about the outcome.

The facts adduced at trial indicate that a controlled "buy" was set up by undercover police officers Helen Rusinskas and Linda Nelson. The officers met with their contacts, Wes Riley and Rich Word, in a motel room on December 17, 1976, at about 11 a.m. Riley counted the pre-arranged funds of $4,500 and then made a phone call. Defendant arrived about 25 minutes later, and, when asked by Word if he had brought the "tick" with him, defendant responded that he had not. Defendant noted the presence of police all over the area and suggested that they take a ride.

Defendant directed Nelson and Word to wait in the motel and he, Rusinskas and Riley left in a police undercover vehicle. At defendant's direction Rusinskas drove in an evasive manner until they parked at 5200 South La Porte. Riley left the car after a conversation with defendant and returned stating that a resident had questioned him about what he was doing as he opened the hood of the car. Defendant then left the vehicle and returned in several minutes.

Defendant directed Rusinskas to drive again and then to park in the 5100 block of South Lavergne across the street from defendant's vehicle. Riley then gave money to the defendant and after counting it, defendant told Riley to get the "tick" as he motioned to his car. Riley reached into the driver's side of the car, picked up a package and returned to the car with it tucked under this jacket. Defendant then walked across the street and Riley reentered the undercover vehicle and drove off with Rusinskas, who, in the meantime, had given the prearranged brake light signal that the sale had been completed. Riley gave the officer a package of 5 plastic bags containing a white powder which she put in her purse and later placed in a narcotics envelope for analysis. This was later admitted into evidence.

Officer Alvisu radioed the police team that he observed the signal indicating that the sale had been completed. He saw defendant walking toward his car and approached him. The defendant then fled on foot, and Officer Carter testified that he followed defendant through several gangways and observed him throw something on a garage roof. A bundle of money was later recovered from the roof where he observed defendant toss the object. After the chase, defendant was apprehended at a shoe store.

No serious question has been raised with regard to defendant's participation in this sequence of events, and the thrust of defendant's argument at trial and on appeal was directed to whether or not the State proved beyond a reasonable doubt that the substance was a Schedule III controlled substance. Section 401(d) provides that one who delivers any amount of a controlled substance classified in Schedule III in an amount less than 300 grams is guilty of a Class 3 felony (Ill. Rev. Stat. ch. 56½, par. 1401(d)). The Controlled Substances Act states in pertinent part that:

"(a) The controlled substances listed in this section are included in Schedule III.

\* \* \*

(c) Unless listed in another schedule, any material, compound, mixture or preparation which contains any of the following substances having a potential for abuse associated with a depressant effect on the central nervous system.

\* \* \*

(10) Phencyclidine (PCP) \* \* \*." (Ill. Rev. Stat. 1975, ch. 56½, par. 1208(a)(c)(10).)

Defendant contends that the State failed to prove beyond a reasonable doubt that the defendant delivered (1) a Schedule III controlled substance, (2) a compound containing phencyclidine, or (3) a substance with a depressant effect on the central nervous system.

Testimony regarding the substance was elicited from three chemists. Gerald Pazin, a forensic chemist with the Chicago Police Department, testified that he analyzed the white powder which was delivered by the officers. He conducted two screening tests which produced a result consistent with the preliminary tests for phencyclidine. He then conducted an infrared test, which he described as a specific test, where a sample is purified by an extraction process and placed on an infrared spectrometer. A graph was produced which was compared against the standard in the Chicago Police Department for identification purposes of an unknown substance. The graph produced showed the match to be a positive identification of the white powder as phencyclidine. Mr. Pazin testified that this test is conclusive of the fact that the sample tested was phencyclidine. The powder was then dissolved in methanol and placed in the ultraviolet spectrometer. The graph produced was compared with the standard graphs obtained from published literature and knowledge from prior run standards. Based on these tests he concluded that the white powder was phencyclidine.

Robert Moriarity, a professor of chemistry, testified for the defendant. He stated that phencyclidine is a free base which, if treated with hydrochloric acid, forms a corresponding hydrochloride. This process produces two compounds with different chemical formulae. He also

stated that there is a difference between the main compound and the optical isomer and that the four tests performed by the police chemist did not distinguish between the two compounds. He indicated that this could be done by measuring the optical rotation with the polar light. On cross-examination, Moriarity revealed that he had never analyzed phencyclidine. He also stated that the four tests performed were nonspecific tests, but that infrared analysis was more specific than ultraviolet analysis. He further stated that phencyclidine is a free base which will combine with an acid and form a salt. When it is combined with hydrochloric acid it converts to phencyclidine hydrochloride, which makes it water soluble but retains a phencyclidine base. He also stated that the phencyclidine base is not affected by the addition of hydrochloride or hydrobromide but the substance is converted to a totally different compound. In response to a question by the court, Mr. Moriarity stated that an isomer of phencyclidine would produce a reading similar to phencyclidine if subjected to infrared and ultraviolet tests. He stated that the spectrum, which was entered by the prosecution, generates a wave length for phencyclidine hydrochloride, which is a different compound from phencyclidine though both contain phencyclidine as a base.

Mr. Pazin was recalled as a rebuttal witness and testified that he analyzed the white powder with hydrochloric acid which turned the powder into phencyclidine hydrochloride. He described phencyclidine hydrochloride as a compound and a salt of phencyclidine, a material which contains phencyclidine. On cross-examination he stated that if you add hydrochloric acid to phencyclidine hydrochloride you would still have a salt, but if added to an unknown substance you would not know whether you started with the salt or not.

Terry Del Cason, a chemist employed by the Drug Enforcement Administration of the United States Department of Justice, testified in rebuttal that when hydrochloric acid is added to phencyclidine it does not change phencyclidine in such manner that it is no longer related to phencyclidine. He stated that phencyclidine is a tranquilizing drug originally intended as an anesthetic or analgesic. He further stated that if equal amounts of phencyclidine or phencyclidine hydrochloride were ingested or injected, based on the weight of phencyclidine in each compound, that the effect on the body would be the same.

The court entered a general finding of guilty after determining that the defendant's actions clearly amounted to a delivery within the meaning of the statute. With respect to the definition of the drug, the court found it reasonable to believe that the drug was included under the broad definition of phencyclidine but was puzzled as to why salts and isomers were clearly set forth in different parts of the statutes but not in this one. On this basis the court allowed the defendant to remain out on bond.

Defendant's motions for judgment of acquittal and renewed motion for a directed verdict were subsequently denied, and defendant has appealed.

Defendant first alleges that the State has failed to prove beyond a reasonable doubt that he delivered a controlled substance included in Schedule III of the Illinois Controlled Substances Act. He contends that salts, isomers and salts of isomers of phencyclidine are not specifically included in Schedule III with reference to phencyclidine, as they are with many other controlled substances in all five drug schedules, and since the State did not determine whether the substance was phencyclidine in its free base form or a salt, he was not proven guilty beyond a reasonable doubt of delivering a Schedule III controlled substance. The State contends that the substance was a controlled substance within the meaning of section 208(c)(10) of the Controlled Substances Act, since it was proven to be a material or compound which contained phencyclidine.

■■ The plain language of the statute indicates that "any material, compound, mixture or preparation" which contains phencyclidine is a controlled substance. The testimony clearly revealed that the substance was identified as a material or compound containing phencyclidine. In the testing process, hydrochloric acid was added to the substance which produced phencyclidine hydrochloride, a salt and compound. The chemists testified that phencyclidine and phencyclidine hydrochloride have phencyclidine as a base, so that if the sample was already in its salt form, there would be no effect on whether or not the substance contained phencyclidine. Since it was determined that the sample contained phencyclidine, we find that it is included within the substances enumerated in Schedule III and that the State sustained its burden of proof.

■■ Defendant further contends that the legislature intended that the word "compound" be used in its pharmaceutical sense rather than in a chemical sense. In this way "compound" would include nonchemical mixtures which can be dispensed in different physical states, such as pills, powders or liquids, but would not include salts, isomers and salts of isomers except where specifically enumerated. He refers to the numerous references in the five schedules where the legislature has enumerated these forms, and contends that if it did not intend the term to be used in the pharmaceutical sense, then references to salts and isomers are redundant. As a further indication that these forms were not included in the schedule, he points out that the Controlled Substances Act which became effective on January 1, 1980, specifically includes the salts, isomers and salts of isomers of phencyclidine. We find defendant's interpretation constrained. The legislative intent in passing the Controlled Substances Act indicates that the legislature was interested in curbing the rising incidence of drug abuse and to provide a system whereby the

unlawful and destructive use of controlled substances would be deterred. (Ill. Rev. Stat. 1975, ch. 56½, par. 1100.) We agree with the State that in view of this express purpose it is unlikely that the legislature would provide a penalty only for delivering 300 grams or more of phencyclidine, its salts, isomers, or salts of isomers (Ill. Rev. Stat. 1975, ch. 56½, par. 1401(a)(7)) and yet not include these forms in lesser amounts, since it is the phencyclidine which is the active agent. Likewise, we find it unreasonable to believe that the legislature intended to use the word "compound" in a pharmaceutical sense when the statute is to be utilized and interpreted, not by professionals in pharmacology nor intended for their protection in the lawful conduct of their business, but by law enforcement officials and judicial personnel in curbing drug abuse and determining whether violations have occurred. Likewise, we are unpersuaded by defendant's argument that the specific inclusion of these forms in the latest act is indicative of the fact they were not included in the former. While there is a presumption that a statutory amendment is intended to change the law, it is not conclusive and may be overcome by more persuasive considerations. (See *Bruni v. Department of Registration & Education* (1974), 59 Ill. 2d 6, 319 N.E.2d 37.) We note that in the latest revision of the Controlled Substances Act, phencyclidine is presently listed as a Schedule II substance (Ill. Rev. Stat. 1979, ch. 56½, par. 1206). We believe this revision reflects the legislature's attempt to clarify the designation, and to emphasize the serious nature of this substance by giving it a higher classification, rather than an indication of an addition to the act.

■■ Defendant's third contention is that the State failed to prove that he delivered phencyclidine or any substance with a depressant effect on the central nervous system. He argues that this is a part of the State's case-in-chief, and testimony should not have been allowed after the State rested. While we agree with the court in *People v. Armstrong* (1978), 65 Ill. App. 3d 680, 382 N.E.2d 121, cited to us by defendant, that the State has the burden to prove each and every element of a crime, we do not believe that under section 401 of the Controlled Substances Act the State must prove that the substance had a depressant effect on the central nervous system (*People v. Bolden* (1978), 62 Ill. App. 3d 1009, 379 N.E.2d 912). The criminal offense charged against defendant is the knowing delivery of a controlled substance, which is what the State must prove beyond a reasonable doubt. (See *People v. Cortez* (1979), 77 Ill. App. 3d 448, 395 N.E.2d 1177.) Where the substance is identified as one belonging to the group enumerated in a particular schedule, there is no necessity of proving that it has a potential for abuse associated with a depressant effect on the nervous system. Our interpretation of the statute leads us to conclude that the enumerated substances follow the descriptive language

which identified the substance as having a particular effect rather than another element to be proven.

Lastly, we find that the record does not support defendant's contention that the court expressed doubts as to defendant's guilt which requires reversal. In fact, the court found defendant's actions within the statutory meaning of a delivery of a controlled substance and entered a finding of guilty. The comments to which defendant refers were clearly in reference to the scope of section 208(d) and the court concluded that the substance was a compound which "would be included under the broad definition of (d)." Under these circumstances we find no error and affirm the judgment of the circuit court of Cook County.

Judgment affirmed.

PERLIN, P. J., and HARTMAN, J., concur.