(No. 11377.—Reversed and remanded.)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* ANTONE AHRLING, Plaintiff in Error.

*Opinion filed June 21, 1917.*

1. CRIMINAL LAW—*what necessary to sustain a conviction on circumstantial evidence alone.* Before a conviction can be sustained upon circumstantial evidence, alone, the guilt of the defendant must be so thoroughly established as to exclude every reasonable hypothesis of his innocence.

2. SAME—*Supreme Court will reverse judgment of conviction where evidence is unsatisfactory.* While the conclusions of a jury concerning controverted questions of fact are not lightly to be disturbed, yet the Supreme Court will not hesitate to reverse a judgment of conviction where the evidence of the defendant's guilt is unsatisfactory.

3. SAME—*circumstantial evidence may establish both elements of the corpus delicti in a murder case.* In a murder case the *corpus delicti* consists of the fact of the death as one element and the criminal agency as another, and both these elements may be established by circumstantial evidence where that is the best evidence obtainable, but great caution should be observed in acting upon it.

4. SAME—*testimony of an unimpeached witness cannot be disregarded.* A witness may be contradicted by the facts he states as completely as by direct adverse testimony; and there may be so many omissions in his testimony as to particular transactions or as to his own conduct as to discredit his whole story, but neither the court nor the jury can willfully or through mere caprice disregard the testimony of an unimpeached witness.

5. SAME—*evidence of acts indicating moral turpitude, unconnected with the crime charged, should not be admitted.* Evidence of transactions by the accused involving suspicion of wrongdoing or of acts from which inferences of moral turpitude may be drawn, which have no bearing on the main fact to be proved or the material issues on the trial, should not be admitted.

6. SAME—*when mental condition of deceased may be shown to establish theory of suicide in a murder case.* Where some of the counts in an indictment for murder charge the defendant with having persuaded the deceased, who was his wife, to commit suicide, the question whether she committed suicide is an important fact in determining the defendant's guilt, and the defendant should be permitted to show the mental condition of the wife for a short time immediately preceding her death.

7. SAME—*when burden is on People to establish sanity of the accused.* Whenever the question of sanity is put in issue by facts coming from either side which may raise a doubt of the defendant's sanity it then devolves upon the People to establish his sanity.

8. SAME—*if jury have a reasonable doubt of the sanity of the accused he should be acquitted.* Where the defense of insanity is interposed it is the duty of the jury to consider not only the evidence tending to support the defense of insanity but all the evidence in the case, and if, after such consideration, they entertain a reasonable doubt of the sanity of the accused he must be acquitted.

9. SAME—*an alibi need not be positively proved to support an acquittal.* It is not necessary that the jury should be absolutely convinced of the truth of an alibi to warrant an acquittal on that ground, but it is enough if the proof introduced in support of the alibi produces such a probability of its truth as to cause the jury to entertain a reasonable doubt of the guilt of the defendant of the charge against him.

10. SAME—*evidence raising only a suspicion of guilt will not justify a conviction.* Evidence which does little more than raise a suspicion as to the guilt of the accused under any counts of the indictment will not justify a conviction.

WRIT OF ERROR to the Circuit Court of Jersey county; the Hon. NORMAN L. JONES, Judge, presiding.

SUMNER & REARDON, I. D. SNEDEKER, and D. J. SULLIVAN, for plaintiff in error.

EDWARD J. BRUNDAGE, Attorney General, P. M. HAMILTON, State's Attorney, and NOAH C. BAINUM, (W. J. CHAPMAN, of counsel,) for the People.

Mr. CHIEF JUSTICE CARTER delivered the opinion of the court:

At the September, 1916, term of the circuit court of Jersey county the jury found plaintiff in error guilty of the murder of his wife, Wilhelmina Ahrling, and he was sentenced to serve a term of fourteen years in the penitentiary. This writ of error has been sued out to review the record and proceedings in that case.

The indictment under which plaintiff in error was convicted consisted of five counts. The first and second counts charged him with killing his wife in some way and manner and by some means, instruments and weapons to the grand jurors unknown. The third, fourth and fifth counts charged him with causing her death by poisoning,—that is, by coaxing, persuading, counseling and procuring her to swallow carbolic acid, thereby causing her death.

The remains of Mrs. Ahrling were found, badly burned, lying on the ground in the ruins of their home, which was destroyed by fire on February 21, 1916. For some time previous to her death they had resided on a farm of some 200 acres in Jersey county, about nine miles southwest of Jerseyville. They had living with them at that time their two children,—a daughter, Marie, aged thirteen years, and a little boy aged three years. On December 15, 1915, plaintiff in error sold 156 acres of said farm to Leslie Stamps, agreeing to give possession by the middle of the following March. The remainder of the farm he sold to Travis Ray, agreeing to give possession of this about March 1, 1916. After selling his farm he purchased from one Lee 80 acres of land about six miles east of Jerseyville, Lee agreeing to give him possession upon finding another place. For several days previous to the death of the wife, Francis Hall, a nephew of plaintiff in error, was stopping with them at their home, apparently assisting in the chores about the farm. On Friday, February 18, 1916, previous to the house being burned, Hall and Ahrling started to drive with a team and buggy to the home of plaintiff in error's brother-in-law, Jacob Haag, about eight miles away, but found the roads in such bad condition that they gave up the attempt of driving and walked. Hall testified that plaintiff in error gave no reason for going over to Haag's. Mrs. Haag's testimony disclosed that he came over to get some money which Mrs. Ahrling had left with Mrs. Haag some days

previous with instructions to keep it until she or her hus-
band called for it.   While plaintiff in error was at the
Haag home on that Friday he asked for and obtained the
package containing the money and apparently took the
money out of the package and carried it away with him.
Hall testified that on the way over and back plaintiff in
error did very little talking, but that on the trip home he
told his nephew that they were going to hang him (Ahr-
ling) ; that they would get him (the nephew) up in court
and give him an awful raking.   Hall testified that Ahrling
had told him at other times that the neighbors suspicioned
him and his wife of poisoning horses.   While they were
over at Haag's on this Friday, Ahrling requested Mr. and
Mrs. Haag, if anything happened to Ahrling or Mrs. Ahr-
ling, to take care of his children, and it seems he stated
to them at that time, as he had at previous times, that the
neighbors were suspicioning him and his wife of trying to
poison stock, and that he thought they were going to try
to send him "over the road."   Haag told him he did not
think there was anything to those charges.   Hall testified
that nothing happened out of the ordinary on the Friday
night after they got back home, and that he knew of no
difficulty between plaintiff in error and his wife while he
stopped with them on that night or on any of the days pre-
vious.  Mr. and Mrs. Ahrling arose before Hall did on the
morning of Saturday, February 19, and plaintiff in error
apparently was doing the chores about the farm and house
before Hall got up.   After Hall was dressed Ahrling and
Hall chopped up an old ladder, apparently for stove wood,
and each of them carried an armful of the wood, thus
chopped, into the house.   After they had eaten breakfast,
Hall, at plaintiff in error's request, hitched up the horses
to the buggy and tied them to a fence in the yard.   There-
after plaintiff in error told him that he wanted him to take
the children and drive them over to the Haags.   The chil-

dren were then prepared for the trip, the wife assisting in the work, and one or more boxes were filled with the clothing that it was thought might be needed by the children while at the Haags. Before they started plaintiff in error gave Hall $20, which he told him to give to the Haags to buy clothing for the children, and also gave him a pocketbook with some silver money in it to be given by Hall to the daughter, Marie. How much money was in the pocketbook Hall did not know or whether there was any paper money in it. He also testified that plaintiff in error said at the time he was giving him the $20, while he was holding a roll of bills in his hand, if he thought Haag knew how to use it he would send over the roll of bills to him. Hall's testimony shows, beyond question, that Mrs. Ahrling knew that the $20 was to be sent by Hall to the Haags to buy clothes for the children, as she asked her husband if he had given Hall the money, and remarked during the conversation that she thought $20 would be enough. After the children were in the buggy Hall drove to the road, two or three hundred feet from the house, when plaintiff in error called to him to stop and came and kissed the children good-by, and at Hall's request brought Hall's pipe, which had been forgotten. Hall testified that he gave no reason for wanting to send the children over to the Haags. Hall then asked the plaintiff in error if he could use the team the next day to drive into Jerseyville, where Hall lived. Plaintiff in error told him he could do so,—that he didn't think he would use the team any more. Hall then drove over to the Haags with the children and remained there over night and next morning drove to Jerseyville. Shortly after he had left, Sunday, plaintiff in error came within sight of the Haag home. It appears that Sunday morning he rode on a horse from his home towards the Haag home, and then, when near there, left the main road to take a short cut to the farm. When some distance away he came to a fence that he could

not get his horse through, tied the horse there and walked
on afoot. Haag, on his way to a neighbor's, met him and
told him that Hall had started with the team for Jersey-
ville. Plaintiff in error asked Haag to take the horse and
see if he could catch up with Hall, let Hall have the horse,
and he (Haag) bring the team back. Haag tried to do this
but did not succeed in overtaking Hall. After Ahrling
reached the Haag house he remained some time talking with
his sister on the first floor, and while there placed in a closet
a small package, which was found thereafter to contain a
bunch of keys. It is claimed by the State that these were
keys to the cellar of his home, which he had locked before
he left. Shortly thereafter plaintiff in error went up-stairs
in the Haag home, and his sister in a short time heard him
coughing and spitting and moving about in a nervous way.
She was afraid to go up-stairs to see what was the matter,
but when her husband came home, after hearing as to Ahr-
ling's actions, he went up at once, and Ahrling told him
that he had taken a dose but had put too much water in it
and the thing didn't do any good. When dinner was ready
that day Mrs. Haag asked both men to come and eat. Haag
came but plaintiff in error refused to do so. Later she took
up some food to him, but, as we understand, he did not eat
anything. In the afternoon Haag stayed with him, and tes-
tified that he was sharpening a large jack-knife on the whet-
stone, and from what he said and the way he acted Haag
thought he was going to try to kill himself, plaintiff in er-
ror saying he was tired of living and wanted to be done
with it. Ahrling apparently came down-stairs to the even-
ing meal and stayed there during the evening and went back
up-stairs to bed. Haag occupied the bed with him, but tes-
tified that he was awake most of the night. Mrs. Haag and
the children slept down-stairs. She testified that the plain-
tiff in error left his shoes down-stairs and she saw him get
them in the morning. Haag and his wife both testified as
witnesses for the State. Neither of them was asked directly

by either counsel as to whether plaintiff in error had been up and out of the house during the night, though Haag testified positively that he was with plaintiff in error from the time he went to him after he got home until they left for plaintiff in error's home Monday morning, February 21. When Ahrling and the Haags were up and dressed Monday morning Ahrling said he was going home and Haag volunteered to go with him, Ahrling simply answering, "All right," or something to that effect. They both walked, leading the horse, and went by the road, thinking they would meet Hall coming back from Jerseyville with the team and buggy. When they were several miles from the Haag home they met Hall, and at Hall's suggestion they got into the buggy and drove the team home while Hall rode the horse, following along after them. They saw before they got there a crowd of people about the house, and found on arriving that it had been burned to the ground. Mrs. Haag, just before her husband left home that morning, gave Haag the bunch of keys that plaintiff in error had placed in the closet the day before and told him to give them to plaintiff in error, and Haag handed them to Ahrling on the way over or after they reached the farm.

The record does not show what the wife did after Hall left with the children on Saturday morning, February 19. Plaintiff in error did not testify on the trial, and there is no testimony in the record that he said anything as to what happened at his home after Hall left with the children. There is some testimony that tends to show that some of the curtains on the down-stairs windows in plaintiff in error's home were moved up or down in some of the rooms on the Sunday in question, some of the neighbors saying at one time the curtains were down to the window sill; others saying at other times the shades were partly up. One witness, a girl of about sixteen years, who lived with her parents some distance from the Ahrling farm, testified that on the Sunday in question, between three and four o'clock

in the afternoon, she saw a person moving near the Ahrling home, walking away from her, and thought this person was a woman, but on cross-examination by the State she testified she didn't know whether it was a woman or man. The Ahrling home was seen to be on fire between four and five o'clock on Monday morning, February 21, by some of the neighbors. The first of the neighbors who reached the place arrived there about five o'clock and the house was then practically burned down. It was a two-story frame building, with two rooms up-stairs and two down, a little longer one way than the other. It was heated by a stove or stoves. The remains of the wife were not found for some hours after the house was consumed, and then one of the neighbors, after telephoning to the sheriff at Jerseyville and being so instructed by him, went back and examined the ruins of the house, stirring the ashes and debris with a stick and hoe, and found the remains of the wife. All that remained was a small portion of the back of the head, on which there was some hair remaining, a part of the stomach, part of the intestines and part of the pelvic region of the body, all badly charred and burned. A portion of the flesh on the back part of the hips was unconsumed, together with a small portion of the clothing directly under the hips. The remains, when found, were lying directly on the ground. There was a small cellar under half of the house, but the body was found on the ground under the other half of the house. The body still had a part of the underwear on it and also part of a blue wrapper which Mrs. Ahrling was apparently wearing at the time of her death. An iron bed and springs were found close to the remains, the springs being very close to the remains of the lower limbs of the burned body. The evidence shows that the remains of the two limbs were uneven in length. Some of the witnesses testified that a portion of the bones protruding from the lower limbs were charred, just like "they would ordinarily be if they were burned away." The witness who first found

the body testified that the "edge of the bed springs came where the limbs ought to have been." One of the limbs was practically gone up to the hip joint, and of the other about three inches was left below the hip joint. There was no evidence of any kind to indicate how the fire started or how long it had been burning when discovered by the neighbors between four and five o'clock Monday morning. There is no evidence as to plaintiff in error doing or saying anything after he reached home on Monday morning that in any way bears on his guilt or innocence. He was arrested that day by the sheriff and taken to the jail. That day or the next, while being questioned by the sheriff and State's attorney in the presence of some of his wife's relatives, he told them he had taken carbolic acid at the Haag home and that his wife had "other fellows around." A brother-in-law said, "Tony, you know better than that." Plaintiff in error replied: "She was rotten; if you don't believe me you can ask Gledhill,—he was the doctor,—if it wasn't so." Dr. Gledhill had been their family physician, and testified that he had treated Mrs. Ahrling but had never found that she had any venereal disease or anything to indicate there was any basis for plaintiff in error's charge that she had been around with other men. There was no testimony in the record that they ever had any trouble of any kind. There is testimony that Ahrling was dissatisfied with the sale of his farm and the purchase of the other one and felt that he had made a mistake in making the change; that he had said that his wife could have stopped the sale of the farm had she objected but that she did not do so; that he did not blame her "for wanting to get away; that she was turning black" down there.

There is testimony that Ahrling told some of his neighbors when he stopped at their house a week before the fire that he wished "the whole damn bunch" was dead; that they would be better off. There is testimony by one of the witnesses that plaintiff in error had talked with him some

time before the death of Mrs. Ahrling about being a witness
for him; that he said 'he was liable to be in trouble; that
he had engaged lawyers to look after him and wanted wit-
ness to testify for him.' At the same time he apparently
told this witness he thought the neighbors were charging
him and his wife with poisoning stock, and the witness asked
him if he had actually hired the lawyers and paid the money.
He said he had not paid them any money, and the witness
advised him to do so, and he afterwards told him that he
had gone and paid them some money. There is also testi-
mony to the effect that for some weeks previous to the death
of Mrs. Ahrling plaintiff in error had been hauling away a
part of his grain, furniture and other things about the farm
and leaving a part of them with the Haags and part of
them with his sister-in-law, in Jerseyville. Among the ar-
ticles left in Jerseyville were a picture of his baby, another
picture, some canned fruit and some vegetables. He hauled
some corn to his brother-in-law, Haag, and brought it over
covered with hay, telling Haag that otherwise some of the
neighbors would think that he had stolen it. There is also
testimony that Mrs. Ahrling had acted queerly for some
time before her death, although as to some of the testimony
offered by plaintiff in error's lawyers to show this fact the
court refused to permit it to be introduced.

The theory of counsel for the State, as shown in the
brief filed, is, that "there can be but one reasonable con-
clusion reached of the crime, and that is, Mrs. Ahrling was
killed by her husband, and after her death her body was
deposited under the house on the naked earth by him and
the house fired, and he then proceeded in the early Monday
morning to the home of Haag, his brother-in-law, and that
the story of his getting there on Sunday morning is false.
There can be no other reasonable conclusion. No doubt the
jury accepted this theory of the case and upon that rock
established their verdict, which is reasonable and established
by a strong and connected chain of circumstances." It is

contended also by the State that the evidence already given
as to the condition of the remains tends to show that the
lower limbs of his wife were removed by plaintiff in error
before the building was burned, and that is the only way
to account for their condition when found. The evidence is
not clear as to just how far above the ground the lower
floor of the building was situated at the time of the fire.
The remains were found in a diagonal position on the
ground under the part of the house which had no cellar and
not straight with either direction of the house. It is argued
by counsel for plaintiff in error that if the theory of the
State is correct plaintiff in error would not have placed the
body diagonally but in a straight position between the joists
under the house. There is no evidence in the record that
tends in the slightest degree to show that the body had been
placed under the floor of the house by anyone, or that it
was possible, from the construction of the house, to place
it under said floor.

The conviction is asked in this case on circumstantial
evidence, alone. The undoubted rule in such case is, that
before a conviction can properly be had upon purely circum-
stantial evidence the guilt of the accused must be so thor-
oughly established as to exclude every reasonable hypothesis
of his innocence. (*Mooney* v. *People*, 111 Ill. 388; *Purdy*
v. *People*, 140 id. 46.) Circumstantial evidence, to war-
rant a conviction of crime, must be of a conclusive nature
and tendency, leading, on the whole, to a satisfactory con-
clusion and producing a reasonable and moral certainty that
the accused, and no one else, committed the crime charged.
(*Dunn* v. *People*, 158 Ill. 586; *People* v. *Rischo*, 262 id.
596.) While it is true, as argued by counsel for the State,
that the conclusions of a jury concerning controverted ques-
tions of fact are rarely to be disturbed, because it is their
especial province to determine where the weight of the evi-
dence lies, yet this court will not hesitate to reverse a judg-
ment of conviction in a murder case where the evidence on

which it is based is of an unsatisfactory character as show-
ing the defendant's guilt. (*People* v. *Blair*, 266 Ill. 70;
*People* v. *Campagna*, 240 id. 378, and cases cited.) In a
murder case the *corpus delicti* consists of two elements, viz.:
the fact of death and the criminal agency of another as the
cause of the death. (*Campbell* v. *People*, 159 Ill. 9.) The
rule in this as well as in other jurisdictions is that both
these elements in a prosecution for murder may be proved
by presumptive or circumstantial evidence where that is the
best evidence obtainable, but great caution should be ob-
served in acting upon it. (*People* v. *Campagna, supra.*)
We think it is shown beyond question, from the evidence in
the record, that the remains found in the ruins of plaintiff
in error's home were the remains of his wife, but we do
not think there is any satisfactory evidence to show the
criminal agency of plaintiff in error in connection with her
death. This fire and death occurred in the winter season,
and it must be reasonably presumed that a considerable fire
was required to keep the building warm, it being heated by
a stove or stoves. That buildings of that character are lia-
ble to catch fire is a fact too well known to require any ar-
gument to sustain such conclusion. It is a maxim of our
law that where an act may be attributed to a criminal or
to an innocent cause it will be attributed to the innocent
cause rather than to the criminal one. A crime is never
presumed where the conditions may be explained upon an
innocent hypothesis. (*McCoy* v. *People*, 175 Ill. 224.) It
must be conceded that the body of Mrs. Ahrling was found
in the ruins of her home. There are no facts or circum-
stances in the record to show or determine whether or not
her death resulted from foul means or from accidental burn-
ing of the building. It cannot be determined on this record
that there was any criminal agency exercised by anyone in
connection with her death, much less is there any evidence
in the record to sustain the theory of the State in their brief
that plaintiff in error killed his wife by violent means, placed

279 — 6

her body under the floor, and on Monday morning, after having set fire to the building, went over to the Haag home. The testimony offered by the State shows conclusively that plaintiff in error went to the home of his brother-in-law, Haag, on Sunday morning and remained there all the rest of that day and that night and did not return to his home until Monday, after the building was burned and his wife's remains were found in the ruins. There is no testimony in the record, either circumstantial or direct, that, to our minds, in any way throws the slightest suspicion upon the testimony of Haag and his wife with reference to Ahrling being there all day Sunday and Sunday evening and night and early Monday morning. As we understand the argument of the State, it ought to be presumed from the circumstances in this case that Haag and his wife are testifying falsely because of their interest, but their relationship to plaintiff in error and their interest in the result of the trial furnish no satisfactory basis to justify such a conclusion. The most that can be said is that the record tends to show that they were reluctant witnesses, but there is nothing to indicate that they were testifying falsely with reference to plaintiff in error's whereabouts. It is a well settled rule of law that the positive testimony of a witness, uncontradicted and unimpeached, either by positive testimony or by circumstantial evidence, intrinsic or extrinsic, cannot be disregarded but must control the decision of a court or jury, unless there is such an inherent improbability in the statements of the witness as to induce the court or jury to disregard his evidence even in the absence of any direct conflicting testimony. He may, of course, be contradicted by the facts he states as completely as by direct adverse testimony; and there may be so many omissions in the testimony of the witness as to particular transactions or as to his own conduct as to discredit his whole story, but neither the court nor jury can willfully or through mere caprice disregard the testimony of an unimpeached witness.

(*People* v. *Davis,* 269 Ill. 256, and cases cited; *Dinquel* v. *Dacco,* 273 id. 117.)   If the testimony of Haag and his wife as to the whereabouts of plaintiff in error on Sunday and Sunday night and early Monday morning is to be believed, it was impossible for him violently to have taken the life of his wife and afterwards set fire to the building.

Several counts of the indictment charge that Mrs. Ahrling met her death by suicide, induced or procured by the persuasion of plaintiff in error.   If he did this he must have done it before he left home on Sunday and not thereafter.

In view of our conclusion on this branch of the case it would be unnecessary to discuss the other questions raised in the brief if it were not for the fact that some of these questions might arise on another trial.

The counsel for the State should not have asked a witness if plaintiff in error had not told him that he slept with his daughter, Marie.   This question could have no bearing on his guilt or innocence of the crime here charged, and evidence of other transactions involving suspicion of wrongdoing or of acts from which inferences of moral turpitude may be drawn, which have no bearing on the main fact to be proved or to the material issues on the trial, should not be admitted.   (*People* v. *Pfanschmidt,* 262 Ill. 411, and cases there cited.)   The fact that the court struck out this question after it was answered did not entirely cure the error in view of the record in this case.

Counsel for plaintiff in error were not permitted to show, as they claim they could show by testimony, that Mrs. Ahrling had the same hallucinations as her husband did about her neighbors, as to the Ahrlings being suspicioned of poisoning horses.   The State showed that when she visited her sister-in-law, Mrs. Haag, about a week before her death, she took there with her a package containing money sewed up in a pillow.   Plaintiff in error offered to show that when she gave Mrs. Haag this package she accompa-

nied it by the request that if anything should happen to her and her husband Mrs. Haag and her husband should look after the children. There was other evidence also offered which in a certain way tended to show that Mrs. Ahrling thought the neighbors were suspicious of her as well as her husband. As already stated, several counts of the indictment charged that she had committed suicide and was induced or procured to do so by the persuasion of plaintiff in error. Whether or not she committed suicide was an important fact determining whether or not plaintiff in error was guilty of the crime charged against him. The court did allow the State to prove certain facts showing Mrs. Ahrling's mental condition. We see no reason why it should not have permitted the defense to make proof along the same line under the ruling of this court in *People* v. *Penman,* 271 Ill. 82. This court in *Nordgren* v. *People,* 211 Ill. 425, held it was an error not to permit the defendant (who was accused of murdering his wife) to show that the deceased kept in her room bottles of whisky and strychnine poison, and held it was competent to explain these acts and to show her declarations in which she indicated a disconsolate state of mind, and used expressions that she did not care to live any longer and threatened to commit suicide, and stated that she was lonely and that life was not worth living, that she was blue, and cried at times on account of her depressed mental condition. Under the reasoning of this court in that case we think the court erred, under the indictment in this case, in not permitting the defense to show Mrs. Ahrling's mental condition for a short period of time immediately preceding her death.

Counsel for plaintiff in error argue at considerable length with reference to the correctness of the instructions given on behalf of the State. They insist that several instructions given attempting to define "reasonable doubt" are erroneous. Among others, instruction 6 for the People defined a reasonable doubt as "a serious, substantial and well-founded

doubt, and not the mere possibility of doubt." It is insisted by counsel for plaintiff in error that this court has never defined a reasonable doubt as a "serious doubt." In this counsel are in error. This court has so defined a reasonable doubt in the following cases: *Johnson* v. *People,* 202 Ill. 53; *Smith* v. *People,* 74 id. 144; *Earll* v. *People,* 73 id. 329. It has frequently been stated by this court and other authorities, that any definition on the part of the courts of reasonable doubt only tends to confuse the jury and renders uncertain an expression which, standing alone, is ordinarily well understood as certain and intelligible. All such attempts must necessarily result in simply stating the same proposition in different forms of words, and such words are perhaps usually not more easily understood than the words they are attempting to define. (*People* v. *Barkas,* 255 Ill. 516; *People* v. *Fox,* 269 id. 300; 23 Am. & Eng. Ency. of Law,—2d ed.—955, and cases cited; 8 R. C. L. 220; see, also, for definitions in the various jurisdictions of reasonable doubt and the authorities thereon, 4 Words and Phrases,—2d series,—155-181.) The criticism made in some of these authorities of the attempt to define reasonable doubt may be made of the definitions attempted to be given in the instructions in this case.

It is also insisted that the instructions given with reference to insanity and alibi were misleading, in that (especially on the latter point) they placed the burden of proof upon the defendant. Whenever the question of sanity is put in issue by facts coming from either side which may raise a doubt of the defendant's sanity it then devolves upon the People to establish his sanity. Whether the burden of proof on the question of insanity, technically, ever shifts may well be doubted, but when the defense of insanity is interposed it is the duty of the jury to consider all the evidence, not only that tending to support the defense of insanity but all the evidence in the case, and if, after such consideration, they entertain a reasonable doubt of the sanity of the ac-

cused he must be acquitted. (*People* v. *Casey,* 231 Ill. 261, and authorities there cited; *People* v. *Spencer,* 264 id. 124; 8 R. C. L. 222, 224.) The same reasoning applies in a general way to the question of alibi. If, looking to all the evidence, inculpatory and exculpatory, the jury entertain a reasonable doubt of the prisoner's presence at and participation in the crime they should acquit. It is not necessary that the jury should be absolutely convinced of the truth of the alibi. It is enough if the proof introduced in support of the alibi produces such a probability of its truth as to cause the jury to entertain a reasonable doubt of the charge upon which the defendant is arraigned. (8 R. C. L. 224; *Briggs* v. *People,* 219 Ill. 330; *People* v. *Probst,* 237 id. 390.) The fourteenth instruction given for the People as to the defense of alibi was, as worded, incorrect. As was said with reference to the question of insanity, it may be doubted whether the burden on the question of alibi ever shifts. The burden of proving the defendant guilty in a criminal case rests at all times upon the State. If, either on the question of insanity or alibi, considered with all the other evidence in the case, a reasonable doubt arises as to the guilt of the accused then he should be acquitted. While some of the instructions for the People on the question of alibi were perhaps not as accurately worded as they might have been, we do not think, taking all the instructions together, that they were so faulty as to require a reversal on that ground.

Counsel for the State do not argue that the evidence justifies the conviction of plaintiff in error under the counts of the indictment which charged him with advising and persuading his wife to commit suicide, and, indeed, the evidence in the record would not sustain a verdict on those counts. It is true that various statements were proved as having been made by plaintiff in error to the effect that he wished they were all dead; that they would be better off if they were; that he himself had tried to commit suicide by

drinking carbolic acid, and made remarks and acted when he was at his brother-in-law's the day before his wife's death, in such a way as to lead his brother-in-law, Haag, to think that he wanted to go to the woods to commit suicide, and that he had been sharpening his large jack-knife for that purpose. There is also evidence to the effect that he, as well as his wife, had asked Haag and his wife if anything happened to the Ahrlings to take care of the children, and that on the Saturday previous to the death of Mrs. Ahrling they both joined in sending the children over to the Haags with Hall and had sent with Hall $20 in money to be used for the children's wants and that Mrs. Ahrling knew and consulted with Ahrling about sending this money, but it is also shown that she said that $20 was sufficient to send for the children's needs. Of course, such a statement is entirely inconsistent with the idea that she and her husband intended to commit suicide, as such an amount of money would be entirely insufficient to care for the children any considerable length of time. The record is barren of any testimony that tends in the slightest degree to show that plaintiff in error had talked with his wife about committing suicide or had urged her to commit such an act or that there was any compact between them to commit suicide. It is difficult, if not impossible, to believe, from the evidence in this record, that the jury would be justified in finding that Mrs. Ahrling had committed suicide and thereafter set fire to the building in which her charred remains were found.

The evidence in this record does little more than raise a suspicion as to the guilt of the accused under any counts of the indictment, and such evidence, alone, will never justify a conviction. (*People* v. *Rischo, supra; Marzen* v. *People,* 173 Ill. 43.) If Mrs. Ahrling's death was brought about by a criminal agency it was a most atrocious and revolting crime and necessarily aroused extraordinary interest in the community in which she resided. While this court is committed to the doctrine that the jury in their delibera-

tions are judges of the facts and the weight of the evidence in all criminal cases, still this court will not hesitate to reverse a judgment of conviction in a criminal case where the evidence on which it is based was of such an unsatisfactory character that after a full consideration there remains such grave and serious doubt of the guilt of the accused as leads to the conclusion that the verdict of the jury is the result of passion or prejudice and not of that calm consideration of the evidence which the law requires. (*Keller* v. *People,* 204 Ill. 604.) As presented in the record before us this case is so surrounded with mystery and doubt that it is our duty to set aside the judgment of conviction.

The judgment of the circuit court of Jersey county is reversed and the cause remanded.

*Reversed and remanded.*