**People of the State of Illinois, Plaintiff-Appellee, v. Mary Alice Ellison, Defendant-Appellant.**

**Gen. No. 50,975.**

First District, Second Division.

February 24, 1970.

Gerald W. Getty, Public Defender of Cook County, of Chicago (Andre Mandeville and James J. Doherty, Assistant Public Defenders, of counsel), for appellant.

Edward V. Hanrahan, State's Attorney of Cook County, of Chicago (Elmer C. Kissane, Assistant State's Attorney, of counsel), for appellee.

MR. PRESIDING JUSTICE McCORMICK delivered the opinion of the court.

Mary Alice Ellison, defendant, was charged with voluntary manslaughter in one indictment and with two counts of murder in a second indictment, all of which charges alleged that she struck with her hands and killed Darlene Ellison, her two and one-half-year-old daughter. The trial court directed a verdict of not guilty on one of the two murder counts. The case went to the jury on the remaining murder count and on the voluntary manslaughter indictment. The defendant was found not guilty of murder, but was found guilty of voluntary manslaughter, and was sentenced to a term of not less than seven nor more than fifteen years in the penitentiary.

The defendant appeals from that judgment and argues that she was not proved guilty beyond a reasonable doubt inasmuch as the State's evidence was all circumstantial and "failed to exclude—the State's medical testimony, that is—that her child, who was found floating in the bathtub, drowned." Defendant also complains about the introduction at the trial of certain photographs of the deceased, the refusal of a defense instruction, and the argument of the State's Attorney.

On December 24, 1966, when the defendant and a companion, John Heard, returned from shopping they found that the defendant's three children had smeared hair grease all over themselves and her apartment walls. The defendant then gave Darlene a whipping which, under the State's theory, was the cause of the child's death inasmuch as it resulted in a cerebral edema.

On Christmas morning, when the children got up at 4:30, Darlene would not play with her toys and refused to eat until about 5:30 that afternoon. After eating she defecated on the floor, and John Heard cleaned up the floor while the defendant put the child into a tub of water. Here there is some discrepancy as to whether the defendant then left the apartment or whether she was in the apartment dancing with Heard. At any rate,

the child was left alone in the bathtub for about fifteen minutes, and when Heard finally went into the bathroom he found her floating in the water. He attempted to revive her and when his efforts were unsuccessful the Fire Department was called, but the firemen also were not able to revive the child. While waiting for the Fire Department, a neighbor had also tried to administer artificial respiration, without success. In the ambulance on the way to hospital, Darlene was given oxygen, but when she arrived she was pronounced dead.

The defendant was not charged with involuntary manslaughter, nor was there a charge that she was criminally negligent in leaving a two and one-half-year-old child alone in water up to her chest when the child had shown symptoms of illness. Rather, she was charged with two counts of murder and one count of voluntary manslaughter, based on her striking the child. Consequently, the State had to prove beyond a reasonable doubt that the child died as a result of the whipping she received from her mother, the defendant, on December 24.

The two firemen who took Darlene to the hospital testified that they noticed bruises on her body when she was on the emergency table, and while it appears that some of the wounds were not new, there was testimony of fresh bruise marks, particularly on the forehead and a "raw area on the buttocks."

James W. Henry, chief pathologist of the Coroner of Cook County, who had conducted an autopsy on the deceased on December 26, was called to the stand and admitted that some abrasions were old, but that "other abrasions were recent as were the bruises over the forehead." He estimated that the recent abrasions were a day or two old, and he explained that the child's skull showed "areas of dark red, apparently recent hemorrhage"; that while the skull showed no evidence of fracture the brain revealed abnormally increased weight due

to increased fluid, resulting in flattening of the folds of the brain, a condition known as edema. The doctor made the following comments: "In my opinion, the increased weight of the brain is due to a collection of fluid or edema in the brain with swelling. . . . The cause of death in my opinion was cerebral edema, swelling of the brain which caused apparently or did cause in my opinion respiratory difficulty and also probable cardiac involvement. The correlation I made with this were the contusions about the head. In other words, I feel that the cerebral edema is related to the head injuries . . . ." The doctor felt that the relatively fresh contusions and abrasions were traumatic "probably from a blunt force. By traumatic, I mean that they were inflicted in the sense of what we call trauma by direct physical injury."

The defense argues that the child's death might have resulted from drowning, and in support introduced witnesses who said they had seen a white frothy substance exuding from the child's mouth and nose, a symptom of drowning. Also introduced was the testimony of Victor Levine, a physician who had specialized in pathology and had formerly been associated with the Cook County Coroner's office. He did not perform an autopsy on the deceased, but based on a four-page set of hypothetical factors, gave the opinion that the hypothetical person referred to had died of drowning. He further said that the injuries supposed to have been found on the hypothetical person would not have been sufficient to have caused death.

In contradiction to this testimony the State's expert witness had testified that expulsion of a frothy fluid is often a terminal event not necessarily related to drowning; that the larynx and upper air passages of the child were clear of any appreciable fluid; both lungs floated in water and were of a normal weight; they revealed a minimal amount of frothy fluid, but no water, although

153

there was air in the lungs; and there was no evidence of water in the esophagus and stomach. In the doctor's opinion "the deceased, Veronica Darlene Ellison, did not die of drowning."

The witness explained that there are two ways of drowning; the more common being that of submersion, with water being inhaled into the lungs and major air passages. He had already testified that this condition did not exist and that all indications were the death was not due to submersion drowning. The second manner, emersion drowning, occurs when a victim falls into water, particularly during cold weather, and sustains a sudden spasm of the voice box, preventing air or water from getting into the system. Death by such drowning is comparable to that of suffocation or strangulation. When asked if the presence of frothy substance was not characteristic of drowning, the doctor indicated it was not restricted to drowning cases, but could in fact be caused by placing an oxygen mask over the victim's face in an attempt to resuscitate (as was done here). He stated that if the condition were related to a case it would be drowning by submersion, and that such was not indicated in the death in question.

■ ■ A conflict of opinion is involved. The jury heard and saw the expert witnesses testify; their evidence, as well as all other evidence presented was submitted to the jury for its assessment. It was the function of the jury to weigh the evidence and reach a verdict, and we do not feel that the jury's finding in this case was unreasonable. The State's evidence, if believed, proved the defendant guilty beyond a reasonable doubt, and apparently the jury believed the State's evidence.

The defendant admitted having struck the child on December 24, and Dr. Henry was of the opinion that the physical injuries sustained by the child led to her death the following day. This is not a situation which exists in some cases where even if the court had accepted the

State's evidence as true, the evidence failed to prove the defendant guilty beyond a reasonable doubt. See People v. Bathurst, 116 Ill App2d 419, 253 NE2d 912. In the case before us the jury was entitled to find the defendant guilty if it found the State's evidence credible, and in spite of defendant's attempt to discredit the testimony of the State's pathologist, that testimony was sufficient to prove defendant's guilt.

The defendant cites Sturm v. Employers' Liability Assur. Corp., Ltd., 212 Ill App 354, in support of the proposition that it should be assumed in this case that the child drowned. At page 360 the court said: "Where a man, a few minutes after being seen apparently in good health is found under water, dead, and nothing more is known of the cause of death, the immediate conclusion arrived at is that he was drowned." This statement is sound as a general principle, but it is not applicable to the facts of the present case. Here we are not concerned with an "immediate conclusion" but rather, with the ultimate conclusion arrived at after an autopsy by a qualified physician. Furthermore, the victim in the present case cannot be said to have been in good health immediately before being found in the water. The defendant admitted striking the child, and there was testimony that the following day the child was listless, refusing to play and not eating. This being the case, we could not presume the child was well and suffering from no physical problems when she was placed in the tub of water. The Sturm case is not applicable here.

■ In the case before us the jury heard evidence supporting the view that the child had died as a result of a criminal agency. The jury was entitled to believe that evidence and to conclude therefrom that the child died as a result of the blows administered by her mother. The fact that the defendant offers a defense does not mean that the jury is obligated to accept that defense and reject the State's evidence. Rather, it is the jury's

155

function to weigh the evidence adduced by both sides, and in the present case the jury heard evidence that the child had recent wounds. There was the mother's admission that she had struck the child the night before she died; and although at trial she said she had struck her three or four times, in earlier statements to the police she said she had no idea how many times she had struck her because she was "mad" at the time. In one of the statements to the police she said, "I just whipped her." The jury also heard the pathologist give as his opinion, after he performed the autopsy, that the infant died as a result of cerebral edema caused by a traumatic blunt force. Under such evidence the jury was entitled to find as it did.

█ The defense also argues that the court erred in refusing the following instruction which defense offered:

> The court instructs the jury that if the testimony in this case be such that two conclusions can be reasonably drawn from it, the one favoring the innocence of the defendant, MARY ALICE ELLISON, and the other tending to establish her guilt, then it is your duty under the law to adopt the conclusion favoring the innocence of the defendant, MARY ALICE ELLISON, and find her not guilty.

The defendant reasons that if the baby had really drowned, the jury should have acquitted the defendant, and the refused instruction was proper; that when the court refused the instruction it committed reversible error. The State in reply says the defense has waived this point since the post-trial motion for a new trial failed to point out the complained-of instruction, but simply states, "The court erred in the matter of refusing instructions." Without affording the trial court anything further with regard to the objection it is difficult

or impossible for the trial court to know the true ground of the defendant's complaint.

In any case, the defendant cannot be helped since the trial court gave other instructions which adequately covered the points raised in defendant's refused instruction. In defendant's instruction No. 7 the court explained that the presumption of innocence remains with the defendant throughout the trial and until such presumption is overcome by evidence proving defendant's guilt beyond a reasonable doubt.

The court also instructed the jurors: "The State is required to prove beyond all reasonable doubt that the defendant is guilty as charged before you can find her guilty." He further explained the instruction as follows: "If, . . . the State has established a probability, though a strong one, that the charge is more likely to be true than untrue as to the defendant, and no more, or if the evidence establishes a mere suspicion of guilt, however great, and no more, as to the defendant, or if you have a reasonable doubt from the whole of the evidence as to the guilt of the defendant, it is your duty to find the defendant not guilty."

Defendant's instruction No. 1, also given to the jury, was to the effect that it was the State's burden to prove the defendant guilty on "every material allegation of the indictment, and unless that has been done, the jury should find the defendant not guilty." Thus, the court clearly informed the jury that it was the State's burden to prove beyond a reasonable doubt every element of its case, and if it failed to do so, the jury should return a verdict of not guilty.

In People v. Lockett, 85 Ill App2d 410, 229 NE2d 386, where the defendant had complained that the trial judge had refused one of its instructions, the reviewing court found the subject adequately covered by another instruction, and said at page 415:

"This instruction is broader in scope than the refused one but it sufficiently covers the principles of law contained in that instruction. A court is under no obligation to give more than one instruction on the same subject matter (People v. Young, 398 Ill 117, 75 NE2d 349 (1947)) and if an instruction is given which adequately covers the same subject as the one refused, it is not error for the court to refuse the latter. People v. Moretti, 6 Ill2d 494, 129 NE2d 709 (1955)."

The defendant also cites People v. Lefler, 38 Ill2d 216, 230 NE2d 827, in support of the proposition that she was entitled to the refused instruction. In that case the defendant had been found guilty of involuntary manslaughter of his child. In a statement the defendant had admitted squeezing his baby to keep her from crying, but said that he had not done so intentionally. There was no dispute as to the cause of death but the case revolved around the issues of defendant's intent at the time of the incident. The opposing theories of innocence or guilt were developed from the same set of facts, and the court said that under those circumstances the defendant was entitled to an instruction on his theory of the case. In the case before us, however, there is a dispute over the cause of death, and no agreed-to set of facts. The State sets out to prove that the child's death was a result of the mother's beating, while the defendant attempts to prove the child died as a result of drowning. In Lefler the court was addressing itself to the instructions on opposing theories when such theories "arise out of the same facts," and is not controlling here.

 The defendant complains that she was unfairly prejudiced when during the testimony of Dr. Henry the State introduced, over defendant's objection, four photographs of the child. Defendant argues that the photo-

graphs would necessarily prejudice the jury since they show the child naked and pitiful. The rule regarding admissibility of photographs of deceased persons is stated in People v. Jackson, 9 Ill2d 484, 490, 138 NE2d 528:

> "Whether the photograph of a deceased is properly admissible depends upon whether it has probative value, such as aiding a jury in the better understanding of medical testimony or aiding them in determining the manner in which the wound was inflicted. [Citing cases.] Mindful of the prejudicial emotion that might be aroused by the introduction of a victim's photograph, the courts have, on the whole, been strict in their requirement that a proper purpose be shown for the introduction of such an exhibit."

In Jackson the photographs showed the deceased after an autopsy had been performed, while in the present case the photographs were taken of the victim prior to the autopsy. In Jackson the photograph was introduced when the State reopened its case for the sole purpose of introducing the pictures, after the defendant had rested and after it was already clear that the defendant was not going to challenge the fact that he had stabbed the victim. The State then argued that the picture was admissible as an admission by defendant since the defendant had made a notation on it. The court concluded that the photograph had been offered solely to arouse the emotions of the jury "so that they would administer a more severe penalty." (Page 491.)

By contrast, in the instant case, the pictures were admitted during the State's case-in-chief and during the examination of the principal medical expert. They were proper aids in helping the jury comprehend the doctor's testimony, and they were probative as to the issue of the beating of the child. The rawness of the child's buttocks

and the wound on the forehead were testified to and the jury was entitled to see for itself the nature and severity of the wounds. The fact that the mother admitted striking the child does not render the showing of the photographs irrelevant for the jury still must determine whether the child had been beaten seriously enough to cause her death. The photographs were probative as to the amount of force which had been used.

■ Finally, the defendant asserts that the prosecutor conducted an unfair cross-examination of John Heard, the defendant's companion, which was intended to harass, embarrass and annoy the witness and prejudice the defendant. The defendant argues that the prosecutor abused his privilege in his closing argument by appealing to the jury to consider the defendant's general misconduct and in effect find her guilty because she was a bad woman rather than because she was guilty of the particular crime charged. She argues that the prosecutor misstated the evidence in his final argument when he asked Heard if he had had sexual intercourse with the defendant. Heard said that he had, and further stated that he was the father of a child born to the defendant after Darlene's death. The defense argues that this type of cross-examination has resulted in reversals and cites People v. Ahrling, 279 Ill 70, 116 NE 764, in support of the contention that it is erroneous to question a witness regarding acts of moral turpitude which have no bearing on the question of guilt or innocence. In the Ahrling case, however, the witness who testified regarding the defendant's moral turpitude was not himself being impeached by the State, and his testimony was used solely to display the moral degredation of the defendant.

In the instant case, however, the testimony was given by the very person with whom the defendant had participated in the acts of moral turpitude, and the State urges that such testimony tended to impeach Heard's

160

testimony since the jury was able to see the witness had good reason for lying on behalf of the defendant. Heard said he was not married but had had sexual intercourse with the defendant and was the father of one of her children. By bringing out these facts the State was able to show the extent and nature of the witness' interest and bias in favor of the defendant.

In People v. Smith, 74 Ill App2d 458, 221 NE2d 68, the court found that part of the cross-examination of a defense witness was prejudicial. The witness had been questioned about the defendant's probable relationship with a certain woman. Again, in that case the disclosed relationship was not between the particular witness and the defendant, but rather was between the defendant and some third party. In the case before us it was the witness himself who had the relationship with the defendant, and thus the testimony had an independent value other than that of merely blackening the character of the defendant. The testimony was relevant in that it showed that the witness could have reason to try to protect the defendant, even to the point of lying. We do not say that such an action was commendable, even under the circumstances; however, considering the facts, we do not feel that the State's cross-examination was so prejudicial to the defendant as to require a new trial. While this type of cross-examination should be carefully controlled, in this case there was a legitimate purpose to be served, and therefore the objection to the cross-examination was properly overruled. People v. McGovern, 307 Ill 373, 377, 138 NE 632.

In his closing argument the prosecutor said that the doctor had testified that the edema was the direct result of the blow to the forehead. In the record, however, it appears that the doctor testified that he correlated the edema to the contusions which he believed to have been traumatic and the result of a blunt force. We fail to

see any merit in the argument of the defendant that it was "gross misstatement" in summarizing the doctor's testimony.

The defendant argues that in several instances the prosecutor made unfair comments, but there is no purpose in discussing each of these. Regardless of any deviations found in the argument they do not constitute reversible error, and we must remember that the same jury had heard the evidence. After the hearing in aggravation and mitigation the trial judge expressed the view that he had believed the State's evidence when he said, "The evidence shows that this woman severely beat this little two and a half year old, defenseless youngster, thereby causing its death. . . . Her treatment of this youngster would indicate to the Court that it would be to the best interest of the children if they were raised by someone who is more responsible, more concerned for their welfare, and who doesn't allow savage temper to injure them as severely as was done in this case. The injuries were so severe that it led to death."

██ We agree that the evidence sustains the jury's verdict and the judgment of the court that the defendant was guilty beyond a reasonable doubt.

The judgment of the Circuit Court is affirmed.

Affirmed.

LYONS and BURKE, JJ., concur.