THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* DONNA WOLTER, Defendant-Appellant.
First District (2nd Division)    No. 78-204

Opinion filed October 16, 1979.

James J. Doherty, Public Defender, of Chicago (Ronald P. Alwin, Assistant Public Defender, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr, Pamela Gray, and Thomas Bucaro, Assistant State's Attorneys, of counsel), for the People.

Mr. PRESIDING JUSTICE STAMOS delivered the opinion of the court:

Following a jury trial defendant, Donna Wolter, was convicted of reckless homicide (Ill. Rev. Stat. 1975, ch. 38, par. 9—3) and was sentenced to a 5-year term of probation. On appeal she contends that she was not proved guilty beyond a reasonable doubt because her conviction was based solely on circumstantial evidence which failed to exclude every reasonable hypothesis of innocence.

The homicide occurred shortly before 2:40 a.m. on January 3, 1976, in an underground garage in a suburban apartment complex where defendant lived. Defendant was driving her mother's 1969 Pontiac from its spot in the underground garage toward the electronically operated door to the outside when the car accelerated and pinned her boyfriend, Douglas Moore, between the garage wall and the front of the car, fatally injuring him. Defendant maintains that the acceleration was not voluntary, and that Moore's death was not caused by either her intentional or reckless acts.

On the night of January 3, defendant, accompanied by Moore, attended a surprise birthday party at the Hamler apartment in the building. The party ended about 2 a.m., but both remained for a short time with a few of the other guests. Defendant and Moore left shortly

thereafter, at 2:20 a.m. About 20 minutes later, defendant returned to the apartment in a hysterical condition seeking help. Two men, guests at the party, went to assist her in the garage where Moore's body was discovered pinned between the wall near the garage door and the front bumper of the car. The left front part of the car had hit the wall and garage door's vertical support, with the right front impacting on the garage door. The right rear of the car slid into the middle of the garage door following impact.

Marjorie Hamler, the hostess at the surprise party, testified that she had met defendant during the summer of 1975, and defendant had obtained her driver's license between that time and the incident. She also stated that while defendant may have consumed some beer at the party, defendant did not appear intoxicated. Further, it was stipulated that hospital tests performed about 10 hours after the incident did not show the presence of any drugs or alcohol.

Two occupants of adjacent apartments above the garage area testified for the State concerning what they heard that morning. One testified that he was awakened at about 2:30 to 2:40 a.m. by two people shouting in the garage. This sound continued for about 20 minutes. He also stated that he heard loud booming noises, similar to the sound made by pounding on a car hood. Then, at about 2:55, as he was about to doze off once more, he heard tires screeching on concrete as if a car was accelerating rapidly, followed by a tremendous crash and reverberations. The second witness testified that he was preparing to retire for the night when he heard a high pitched voice in the hall. He looked out the door, but not seeing anything, got back into bed. Approximately 10 to 15 minutes later he heard automobile engines in the basement, which seemed to rev to a higher than normal point, and the squealing of tires. Following these noises, there was a crash, "not an extremely loud crash, but a crash * * *." He went into the kitchen and looked at the clock, which said 2:40.

Paramedics arrived at the garage shortly after 3 a.m. In order to back the car up to free the decedent's body from its pinned position, a pair of woman's high-heel shoes had to be removed from underneath the brake pedals. The paramedics were unable to aid the decedent, who showed no vital signs.

Members of the Arlington Heights Police Department investigated the accident and made several photographs of the accident scene and a detailed sketch of the area. These were introduced into evidence and filed as part of the record on appeal for this court's consideration.

Officer Steve Livas testified that he checked the registration of the 1969 Pontiac and found that it was the property of defendant's mother, who resided in the building. He went to interview her, and while he was

in the apartment, defendant entered and stated, "He's dead, isn't he, I killed him, I don't want to lose my baby." Officer Livas advised defendant of her *Miranda* rights after which her mother took her aside for a short conversation. Defendant then left the room, returning periodically to ask if Moore was dead. Each time her mother commanded her to leave the room.

Sergeant Robinson testified that he viewed the accident scene. He observed tire acceleration marks leading from a parking stall to the accident vehicle. Although these marks did not disclose any signs of braking, he was uncertain whether the brakes had actually been utilized. When Officer Robinson spoke to defendant she stated that she had been at a birthday party with Moore. After they left the party to go to Cal's, a nearby bar, she and Moore went to the car and looked for the garage door opener. At this point in the narrative, defendant's mother entered the room and interrupted the conversation. Sergeant Robinson left the room, and later arranged for defendant to be taken to a hospital.

Sergeant Ronald Von Raalte testified that he examined the accident scene in detail, where he noted tire acceleration marks for a distance of 70 feet leading to the vehicle. The windshield above the driver's seat was broken and hairs were embedded in the glass. These hairs were identified as those of defendant. Several witnesses testified that in all probability defendant struck her head on the windshield, causing the glass to shatter, when the car struck the post.

Sergeant Von Raalte indicated that when he examined the car he found extensive damage to the front driver's side and right rear of the car. In addition the front bumper had a design on it matching the pattern of Moore's jacket. When asked about the single post-impact mark, Von Raalte identified it as a continued acceleration mark.

James Stannard Baker, called as an accident reconstruction expert by the State, examined the accident scene and garage floor about two weeks after the accident. Shortly thereafter, he saw the Pontiac at a different location. Finally, nine months later, he was present when the motor mounts were removed from the Pontiac.

His examination of the vehicle consisted of looking at the linkage between the accelerator pedal and the carburetor. He also checked the carburetor. He did not find any sticking or binding of these mechanisms which would have interfered with the vehicle's normal acceleration. He noted extensive damage to the left front part of the car, which had forced the radiator and engine fan shroud backward onto the engine fan belts upon impact, causing the car to stall after the occurrence.

Baker interpreted the various photographs made at the accident scene and in particular the tire marks shown therein. He explained that tire marks are caused by friction and could indicate acceleration, braking,

or slippage. The latter was defined as the sideways movement of the tire with sufficient force to leave marks. However, under normal acceleration a vehicle would not leave tire marks.

The photographs of the tire marks leading to the point where the Pontiac crashed were initially light and then became darker. Baker explained that the lighter color occurred because the wheels had not spun enough to get hot enough to smear rubber on the pavement. The marks indicated that the car continuously accelerated for 70 feet before hitting the garage wall near the door. Baker calculated that the Pontiac was travelling between 25 and 30 miles per hour at the time it hit the wall by the garage door, and that about 3 seconds elapsed from the time the car started up to the impact.

Baker could not say whether any attempt was made to brake the car, but he said that there was no indication of sufficient application of the brakes. Had the brakes been substantially applied, the wheels would have locked and the tire marks would have been different. Moreover, had substantial braking occurred, the car would have travelled straight into the garage door. However, the photographs of the tire marks showed that the rear wheels of the car had travelled in a sideways direction about 15 feet from the garage door to the point of impact. This sideways thrust was caused by the action of the driver violently steering the car to the left. After the right front corner of the car hit the garage door, the rear end slid sideways at a substantially reduced speed before striking the middle of the garage door. As he reconstructed the accident, the right rear end would then have bounced back slightly. However, he also stated that his opinions originated from the police reports and the photographs alone, because the tire marks were no longer evident on the garage floor at the time of his inspection.

On cross-examination, Baker said that because mechanical problems are rarely the cause of accidents, he looked only for clearly indicated signs of mechanical defects. He did not disassemble the vehicle and did not attempt to make a complete determination of mechanical defects because that is "a very long and expensive undertaking." He further testified that his calculations and assessments were limited by the fact that he was not hired to do a cause analysis, *i.e.*, to find out why the accident had occurred, but rather to do an accident reconstruction, *i.e.*, to reconstruct what happened and in what sequence.

He reiterated that he examined the carburetor and accelerator linkage and removed the air filter, because for acceleration to occur, the throttle must remain open; he found no obvious visual defects in these parts. He also stated that acceleration is usually caused by maintaining one's foot on the accelerator pedal, although speculative alternative bases

did exist. Baker did not know if the Pontiac was equipped with power-assisted brakes, which would require less effort to apply.

Baker was questioned concerning the three motor mounts which had been removed from the Pontiac in his presence. He described a motor mount as two metal plates with a rubber insulation material in between; the insulation lessens engine vibration to the frame of the car and eliminates noise. The bottom plate is fastened to the car frame and the top plate is connected to the engine. The Pontiac had a mount on each side of the engine and one rear mount. Baker stated that he believed that exhibit No. 8 was the rear motor mount, but he said that without the tags, "a motor mount is a motor mount."[1] The two other motor mounts had been whole, without deterioration. But the third mount, identified at trial as the rear mount, was deteriorated and separated because of exposure to hydrocarbons. Baker was aware of the problem of engine motor mount lift syndrome, the lifting of the engine on acceleration with the possibility of accompanying involuntary acceleration, and the fact that this condition would not occur unless the motor mount was separated. However, he stated that he did not know all the implications of that deterioration; and in fact, although an expert in accident reconstruction, he had never done any in-depth study of automobile engines. He had studied automobile engines but not particularly with respect to accident investigation. Once again, he explained that "mechanical failure is quite rare; and there are other problems which are more general in their nature so that I would not be able to be an expert in all kinds of failure of a vehicle."

Baker was cross-examined about a photograph depicting the imprint on the garage floor of the right rear tire of the Pontiac. All witnesses agreed that the imprint was made after the car had hit the garage door. Baker was of the opinion that the imprint was a "pop mark" caused by the tire's suddenly landing on the floor after the car rebounded off the garage door and dislodged some rubber from the tire tread pattern.

Baker stated that if defendant's head hit the windshield at the time of crash, her foot would most likely have lost contact with the accelerator. Any post-impact acceleration marks would thereby have resulted from involuntary acceleration, since for acceleration to continue, the throttle must remain open. However, Baker did not feel that the tire marks indicated post-impact acceleration. He admitted that although the photographs upon which he based his opinion were good, his conclusions might have been different had he examined the original marks carefully.

The defense presented the testimony of the two police accident

---

[1] It had been stipulated on appeal that the report of proceedings was in error where it referred to the exhibit as No. 8; it instead should have referred to No. 7, which was the left front motor mount and the motor mount that was actually removed from the car.

investigators who were called to the scene immediately following the accident. Both testified that the right rear tire mark, which Baker had called a "pop mark," was instead a post-impact acceleration mark. Each officer had extensive investigation experience and examined tire marks such as these on a regular basis. Following their testimony, the defense renewed its motion for a directed verdict. The motion was denied and the jury returned a verdict of reckless homicide. From that verdict, this appeal was taken.

■■ Although much information about motor mount syndrome, feathering of power brakes, and other speculative mechanical defects has been presented in defendant's brief, we believe that her theory of innocence most simply stated is that the excessive depression of the accelerator was not caused by her voluntary act. It is basic that the State must prove every element of the crime charged. (See, *e.g.*, *People v. Becker* (1953), 414 Ill. 291, 303-04, 111 N.E.2d 491.) One of the elements of reckless homicide is that there be a voluntary act which results in the death of another person. (See Ill. Rev. Stat. 1977, ch. 38, par. 4—1("[a] material element of every offense is a voluntary act")). All of the evidence, examined in the light of either the State or defense theories, indicates abnormal acceleration for a distance of approximately 70 feet, resulting in the death of Douglas Moore. The State contends that this abnormal acceleration resulted from defendant's voluntary depression of the accelerator; defendant contends that it was involuntary. To support her theory of involuntary excessive acceleration, defendant relies on the testimony of the three police officers (one State and two defense witnesses) that there was a post-impact acceleration mark. This testimony would indicate that the acceleration was involuntary and possibly caused by mechanical defects. Under defendant's hypothesis, her head struck the windshield at the time of impact, theoretically pulling her foot off the accelerator, and negating the State theory of continued voluntary acceleration. The defendant's theory is consistent with the disputed continued post-impact acceleration marks.

■■ It is elementary that the commission of a crime may be proved by circumstantial evidence. (*E.g.*, *People v. Russell* (1959), 17 Ill. 2d 328, 331, 161 N.E.2d 309.) That evidence must be of such a conclusive nature as to lead to the certain result of the defendant's guilt. "The undoubted rule in such case is, that before a conviction can properly be had upon purely circumstantial evidence the guilt of the accused must be so thoroughly established as to exclude every reasonable hypothesis of his innocence." (*People v. Ahrling* (1917), 279 Ill. 70, 80, 116 N.E. 764.) Nevertheless, the accused may not expect the jury to search out a series of possible explanations of the events compatible with innocence and elevate them to the status of a reasonable doubt. (*People v. Russell* (1959), 17 Ill. 2d 328,

331, 161 N.E.2d 309; *People v. Huff* (1963), 29 Ill. 2d 315, 320, 194 N.E.2d 230.) Instead, in the instant case, facts were presented to the jury by both the State and defense which were equally compatible with two theories, one of innocence, one of guilt. To be sure, without the disputed post-impact acceleration mark and the shattered windshield, defendant's hypothesis would lose much of its credibility. But these two material facts remove defendant's theory from improbability and provide substantiation for its viability. It was incumbent on the State, in establishing the guilt of the accused, to exclude this other reasonable hypothesis. See, *e.g.*, *People v. Lewellen* (1969), 43 Ill. 2d 74, 78, 250 N.E.2d 651.

In *People v. Garrett* (1975), 62 Ill. 2d 151, 339 N.E.2d 753, our supreme court reiterated that not only must the elements of the crime be proved, but the evidence must also exclude the reasonable hypothesis of innocence which might arise from the facts presented to the jury. There, the defendant was charged with the murder of a woman found in a motel room. The defendant did not deny his presence in the room at the time of death, but denied any involvement in her murder. At trial the reasonable hypothesis of suicide was presented as an alternative to murder. A fair reading of the evidence suggested that although the woman may have been murdered, it was equally plausible that she committed suicide. The State failed to rebut effectively the evidence of her suicide note, burn marks consistent with suicide, and other pathological and behaviorial material supporting the defense hypothesis.

Similarly, the State here has failed to rebut evidence that the abnormal acceleration may have been caused by a mechanical defect. There was affirmative evidence presented to the jury consistent with involuntary acceleration; that the throttle was open following impact while defendant's foot was off the accelerator.

The State's only witness who might have rebutted the hypothesis, insofar as it was based on a mechanical defect, was Baker. Baker instead emphasized that he was not an expert in automobile engines, that he had not made an exhaustive inspection of the Pontiac involved, that he had not been hired to determine the organic causes of the accident but only to reconstruct it, and that he had not participated in the disassembly of the automobile.

We feel that the holding in *People v. Dougard* (1959), 16 Ill. 2d 603, 607-08, 158 N.E.2d 596, is apposite:

> "[I]n criminal cases it is the duty of this court to review the evidence, and, if there is not sufficient credible evidence, or if it is improbable or unsatisfactory, or not sufficient to remove all reasonable doubt of defendant's guilt and create an abiding conviction that he is guilty, the conviction will be reversed. It is the

duty of this court to resolve all facts and circumstances in evidence on the theory of innocence rather than guilt if that reasonably may be done, and where the entire record leaves us, as this one does, with grave and substantial doubt of the guilt of the defendant, we will not hesitate to reverse the judgment."

Although defendant did not present the jury below with a well documented exposition of the engine mount syndrome or any other alleged mechanical defect, we do not believe that the burden was on defendant to do so. The facts adduced were sufficient to raise the reasonable hypothesis that the excessive depression of the acclerator was involuntary. In the light of *Dougard, Garrett* and other substantial case law, absent excluson of defendant's theory, we must resolve the facts in favor of innocence. Defendant has not been proved guilty beyond a reasonable doubt, and her conviction must be reversed.

Reversed.

DOWNING and HARTMAN, JJ., concur.